573 F.2d 309
 1978-1 Trade Cases 62,041
 The STATE OF ALABAMA, Dr. Wayne Teague, as Superintendent of
Education of the State of Alabama and the Perry
County Board of Education, Plaintiffs-Appellees,
v.
BLUE BIRD BODY COMPANY, INC., Blue Bird Mid-South, Inc.,
Superior Coach Corporation, Sheller-Globe Corporation,
Thomas Built Buses, Inc., Ward School Bus Mfg., Inc., Wayne
Corporation, Carpenter Body Works, Inc., Waits Sales &
Equipment Co., Inc., Duncan Mfg. & Equipment Co., Inc.,
Alabama Bus Company, Eddins Bus Sales, Inc., Carpenter Bus
Sales of Alabama, Everett Equipment Co., Inc. and Phillips
Supply Co., Defendants-Appellants.
 No. 76-3529.
 United States Court of Appeals,
Fifth Circuit.
 May 22, 1978.
 
 Edward W. Killorin, Thomas W. Rhodes, Gambrell, Russell, Killorin & Forbes, Atlanta, Ga., John R. Matthews, Jr., Ball, Ball, Matthews & Lamar, Montgomery, Ala., for Blue Bird Body Co., Inc.
 Harry T. Ice, James E. Hawes, Jr., Ice, Miller, Donadio & Ryan, Indianapolis, Ind., Joseph C. Espy, II, Montgomery, Ala., for Carpenter Body Works, Inc.
 Bruce L. Smith, Eastman, Stichter, Smith & Bergman, Toledo, Ohio, Robert Huffaker, Rushton, Stakely, Johnston & Garrett, Montgomery, Ala., for Sheller Globe Corp.
 Stephen W. Terry, Jr., Baker & Daniels, Indianapolis, Ind., M. R. Nachman, Jr., Steiner, Crum & Baker, Montgomery, Ala., for Thomas Built Buses, Inc.
 Robert E. Jensen, Williams & Jensen, Washington, D. C., D. Coleman Yarbrough, Jones, Murray, Stewart & Yarbrough, Montgomery, Ala., for Ward School Bus Mfg., Inc.
 Trammell E. Vickery, Kent E. Mast, Hansell, Post, Brandon & Dorsey, Atlanta, Ga., William I. Hill, II, Hill, Hill, Carter, Franco, Cole & Black, Montgomery, Ala., for Wayne Corp.
 John R. Matthews, Jr., Ball, Ball, Matthews & Lamar, Montgomery, Ala., for Eddins Bus Sales, Inc.
 James R. Shaw, Bessemer, Ala., for Waits Sales and Equipment.
 Sam R. Shannon, Jr., Shannon, Odom, Robertson & Jackson, Birmingham, Ala., for Duncan Mfg. & Equipment Co. and Carpenter Bus Sales of Ala.
 B. F. Garrett, Garrett, Thompson & Price, Brewton, Ala., for Everett Equipment Co.
 Richard H. Gill, Hobbs, Copeland, Franco & Screws, Montgomery, Ala., for Phillip Supply Corp.
 Thomas W. Rhodes, Atlanta, Ga., for Eddins Bus Sales, Inc.
 Thomas W. Thagard, Jr., Montgomery, Ala., of counsel: William J. Baxley, Atty. Gen. of Ala., Montgomery, Ala., George L. Beck, Deputy Atty. Gen., Montgomery, Ala, E. C. Hornsby, Special Asst. Atty. Gen., Tallassee, Ala., Smith, Bowman, Thagard, Crook and Culpepper, Montgomery, Ala., for appellees.
 Appeal from the United States District Court for the Middle District of Alabama.
 Before COLEMAN and FAY, Circuit Judges, and KING, District Judge.*
 FAY, Circuit Judge:
 
 
 1
 We are presented today with an interlocutory appeal from a district court order certifying this antitrust case as a class action on behalf of two plaintiff classes. The issue is whether the district court erred when it certified both a "national class" and a "state class" under Fed.R.Civ.P. 23(b)(3). For a number of reasons, we feel that the granting of class action status as to the plaintiff national class was inappropriate, and, as to that class, we reverse the district court's order and remand for further proceedings.
 
 I. FACTS
 
 2
 This is a private antitrust class action brought under § 4 of the Clayton Act, 15 U.S.C. § 15, by the State of Alabama, its Superintendent of Education, and the Perry County (Alabama) Board of Education against six manufacturers of school bus bodies[1] and seven Alabama distributors of those bus bodies.[2] The amended complaint alleges two claims. Plaintiffs assert their first claim (the "state" claim) on behalf of a class of all governmental entities within the state of Alabama which purchase school bus bodies, and allege a conspiracy to fix prices on the part of these manufacturers and their Alabama distributors through a process of rotation of bids and accommodation bidding.[3] Plaintiffs' second claim (the "national" claim) is asserted on behalf of all governmental entities in the United States which purchase school bus bodies.[4] This national claim is only against the manufacturers, and it alleges, in addition to a price-fixing charge, a conspiracy to monopolize in violation of § 2 of the Sherman Act.
 
 
 3
 On July 15, 1976, District Judge Robert E. Varner entered the order forming the basis of this interlocutory appeal.[5] In that order, Judge Varner proposed a plan which he felt would allow this case to proceed as a class action. The plan consisted of bifurcating the trial between the liability and damage issues,[6] and, after a jury determination on the issue of liability of the nationwide defendants, severing the cases of class members by states and transferring the severed cases to the district courts in their respective states for the determination of the damage issues.[7] As to such transfers, Judge Varner relied upon 28 U.S.C. § 1404(a) which provides:
 
 
 4
 For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought.
 
 
 5
 Judge Varner, however, also pointed out in his July 15th order that he would not certify the national class if this Court were to determine that his plan to handle this litigation through bifurcation and transfer was improper. He reached this conclusion because in his opinion the national class "would so heavily burden this Court's docket as to paralyze the federal court system in this district, and because of the impropriety of requiring parties throughout the United States to try this cause of action in Alabama." App. 177.
 
 A. The School Bus Industry
 
 6
 An analysis of the propriety of Judge Varner's order requires us to examine closely the school bus industry and to attempt to understand the product, the sellers and the buyers.[8] While an inquiry into the merits of a cause of action is never appropriate when making a class action determination, a full understanding of the underlying facts is usually essential if one hopes to correctly apply the requirements of Fed.R.Civ.P. 23.
 
 
 7
 School buses are comprised of two basic parts bodies and chassis which are separately manufactured. These bodies and chassis are sometimes sold as complete bus units and other times are sold separately. Plaintiffs brought this lawsuit only against the six manufacturers and seven Alabama distributors of school bus bodies and did not join as defendants other distributors throughout the country or the manufacturers of school bus chassis. The manufacturer defendants in this lawsuit are said to be the only manufacturers of school bus bodies in the United States, but there are approximately 400 local distributors of school buses across the country.
 
 
 8
 Each school bus body is a passenger coach for which the structure, configuration, and equipment are designed to meet an individual purchaser's specifications. The fifty states have varying and comprehensive school bus specifications. These specifications prescribe the physical configuration, materials, construction, and equipment for school buses used in that state. Also, many local governmental purchasers require even more stringent standards than those contained in the state specifications. In addition to the differences in school buses required by minimum state or local specifications, significant variations result from the particular needs of a purchaser. For example, special equipment and design must be utilized to accommodate the handicapped; the number of pupils that require carriage dictates size; engine size varies according to the terrain that must be traveled; and the climate determines the heating and cooling equipment to be installed. A. 243. Thus, a school bus is not a homogeneous product. Each bus must meet the individualized specifications of thousands of different public entities which purchase school buses each year.[9]
 
 
 9
 There are also substantial differences in the ways in which public entities purchase school buses. Initially, it must be recognized that school buses are, for the most part, sold to the independent distributors in the various states who in turn resell them to their customers.[10] In all, the defendant manufacturers and their local distributors sell school bus bodies to more than 16,000 governmental entities nationwide. The authority for these governmental entities to purchase school buses is generally granted by a state statute, but in some instances local school systems may require buses to be purchased in a particular manner. Thus, state purchasing procedures may be governed by statute, by state-wide regulations, by rules of various purchasing entities, or by local customs and habits.
 
 
 10
 The most common purchasing practice utilized by the states is the solicitation of competitive bids and the awarding of the contract to the lowest responsible bidder.[11] Several states maintain complex systems whereby the state government's purchasing department solicits competitive bids,[12] and, based on such bids, establishes a maximum bid price for each basic type of school bus. Other public bodies or agencies authorized to make school bus purchases are then free to purchase buses at the maximum state bid price or to solicit bids on their own behalf and enter into purchase agreements with the lowest responsible bidders provided that these bids do not exceed the maximum state bid. Several other states have unique purchasing procedures. For example, the defendants point to Florida where the purchase prices may be negotiated rather than bid when it is determined to be in the best interest of the school district. App. 249. In Maine, there is no detailed statutory procedure governing purchases. Rather, Maine law gives local school superintendents broad discretion to purchase school buses "in the most economical manner that is consistent with the welfare and safety of pupils," subject only to approval by the State Commissioner of Educational and Cultural Services. App. 249. Finally, the defendants bring to our attention the practices employed in three other states[13] which do not require the public agencies to solicit bids at all, but instead authorize each agency to establish its own purchasing practices and procedures. App. 250.
 
 B. The Alleged Antitrust Violations
 
 11
 The plaintiffs' claims against the defendants are that the defendants have since 1960 unlawfully engaged in a conspiracy to restrain trade, and have illegally entered into and maintained contracts and agreements in restraint of trade. In the first claim (the state claim) of their amended complaint, the plaintiffs allege that these violations have consisted of:
 
 
 12
 (C)ontinuing contracts, agreements, understandings, concert of action or courses of conduct among the defendants to do the following:
 
 
 13
 (a) Fix, maintain and stabilize prices for the sale of school bus bodies to the State of Alabama and local agencies within said State purchasing the same at artificially high, noncompetitive levels; and
 
 
 14
 (b) Allocate customers and sub-markets in such trade or commerce among themselves; and
 
 
 15
 (c) Not compete in such trade or commerce.
 
 
 16
 App. 95.
 
 
 17
 The national claim is almost identical,[14] but rather than limiting the scope of the claim to the "State of Alabama and local agencies within said State," the national claim alleges violations on behalf of all "similarly situated governmental or public bodies or agencies within the United States except for the State of Georgia, which have been and will continue to be injured in their business and property by the contracts, agreements, conspiracies, and course of conduct herein described." App. 88.
 
 
 18
 The plaintiffs, unfortunately, have not been very specific in explaining how and why the defendants conspired to fix prices, etc. Their lack of specificity at this stage might be attributed to the fact that they have not been allowed any discovery in this area. However, the plaintiffs do set forth in their amended complaint some generalized descriptions of how they perceive the defendants to have acted illegally. For example, in their state claim the plaintiffs initially contend that certain of the defendants have agreed among themselves not to sell school bus bodies and not to compete for the sale of school bus bodies with respect to purchases by the State of Alabama or any board of education or other public agency within Alabama. The plaintiffs allege that from time to time some defendants have submitted bids to county boards of education or other public agencies within Alabama, but such bids were not competitive and were submitted solely to give the appearance of competition. App. 96. Secondly, the plaintiffs contend that the defendants have each year fixed a price range for the sale of school bus bodies to the State of Alabama and to county boards of education within Alabama. The defendants used this price range to rotate bids among themselves for the purpose of allocating among themselves certain percentages of the annual sales to the Alabama purchasers. App. 96. The plaintiffs also contend that the price range fixed each year within the State of Alabama has consistently exceeded the prices at which buses manufactured by these defendants have been sold to other public agencies outside of Alabama, and that these prices are artificially maintained at a non-competitive high level. The national claim contains the same averments as the state claim and alleges generally that the illegal patterns of conduct which took place in Alabama were implemented in each individual state in the country.
 
 II. The Applicable Law
 A. Rule 23 and Class Action Certification
 
 19
 After the filing of this cause of action by the State of Alabama, it was the duty of the trial court to determine "as soon as practicable" whether the case should be allowed to be maintained as a class action. Fed.R.Civ.P. 23(c) (1). In making this determination under Rule 23, the district court must decide whether the plaintiffs have satisfied all the requirements of section (a) of Rule 23, and whether the proposed class properly falls within one of the subsections of 23(b). Section (a) provides that a class may be certified if:
 
 
 20
 (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.
 
 
 21
 If the above prerequisites have been met, the district court then directs its inquiry into the propriety of the class under one of the subsections of 23(b). In our case, the parties agree that the only subsection of 23(b) we need to consider is subsection (3) which provides that an action may be maintained as a class action if:
 
 
 22
 (T)he court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.
 
 
 23
 The factors pertinent to the required findings of predominance and superiority are delineated in the remainder of subsection (3). These factors include:
 
 
 24
 (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum, (D) the difficulties likely to be encountered in the management of a class action.
 
 
 25
 It is important that the district court be mindful of the policy underlying Rule 23 when making the determinations required for a (b)(3) certification. This policy is set forth in the Advisory Committee's note on the 1966 amendment to Rule 23. The note explains that a (b)(3) action "encompasses those cases in which a class action would achieve economies of time, effort, and expense, and promote uniformity of decisions as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." Fed.R.Civ.P. 23, Advisory Committee Note (1966). With this policy in mind, the note then sets forth various legal situations which are either particularly suited or unsuited for class action treatment.[15] This list of examples, however, provides us with little guidance on how to handle the controversy before us, because the note specifically states that, "Private damage claims by numerous individuals arising out of concerted antitrust violations may or may not involve predominating common questions." Id. The lesson to be learned from the examples set forth in the Advisory Committee Note and from the many cases discussing the propriety of class certification in antitrust cases is that there are no hard and fast rules which have developed regarding the suitability of a particular type of antitrust case for class action treatment. The unique facts of each case will generally be the determining factor governing certification.
 
 
 26
 B. The Elements of an Antitrust Cause of Action Under § 4 of the Clayton Act.
 
 
 27
 In order to make the findings required to certify a class action under Rule 23(b)(3) (that common issues predominate, etc.), one must initially identify the substantive law issues which will control the outcome of the litigation. In our case, the plaintiff's principal allegation against the defendants involves a violation of § 1 of the Sherman Act which provides that "every contract, combination . . . or conspiracy in restraint of trade or commerce . . . is . . . illegal." The word "every", of course, is not meant literally, and for many restraints a standard of reasonableness has been adopted to judge their lawfulness. See, e. g., Standard Oil Co. v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911); Chicago Board of Trade v. United States, 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683 (1918). Certain practices, however, have been deemed to have such a "pernicious effect on competition," Northern Pacific Ry. Co. v. United States, 356 U.S. 1, 5, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958), that they are considered to be per se violations of § 1. Included among these per se violations is price-fixing.[16] The Supreme Court has stated that any combination or agreement between competitors "formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity in interstate or foreign commerce is illegal per se." United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 223, 60 S.Ct. 811, 844, 84 L.Ed. 1129 (1940). No defense or justification of any kind is recognized where price-fixing is shown because "whatever economic justification particular price-fixing agreements may be thought to have, the law does not permit inquiry into their reasonableness. They are all banned because of their actual or potential threat to the central nervous system of the economy." Id. at 226 n.59, 60 S.Ct. at 845. Hence, it is no defense that the price fixed was actually a "reasonable price." United States v. Trenton Potteries Co., 273 U.S. 392, 397-98, 47 S.Ct. 377, 71 L.Ed. 700 (1927), nor is it necessary to show an actual effect on prices in order to show a violation. It is the purpose of the agreement which renders it unlawful, regardless of its actual effect. United States v. Socony-Vacuum Oil Co., 310 U.S. at 225-26 n.59, 60 S.Ct. 811.
 
 
 28
 A distinction, however, must be made between proving a violation of the Sherman Act, and the establishment of civil liability under § 4 of the Clayton Act, 15 U.S.C. § 15. Section four provides:
 
 
 29
 That any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee. (emphasis added)
 
 
 30
 Proof of a violation of the Sherman Act standing alone does not establish civil liability under § 4 of the Clayton Act. There must under § 4 be proof of "injury to business or property" before a Sherman Act violation becomes cognizable as a private civil remedy. As we shall see in the case before us, awareness of the distinction between conduct which violates § 1 of the Sherman Act, and the elements which establish liability in private party litigation under § 4 of the Clayton Act, is vital.[17]
 
 
 31
 This Circuit has clearly set forth the elements which must be established in order to recover treble damages under the antitrust laws. In Terrell v. Household Goods Carriers' Bureau, 494 F.2d 16 (5th Cir. 1974), we explained that a prerequisite to recovery was a showing by the plaintiff of a violation of the antitrust laws, the fact of damage, and some indication of the amount of damage. Id. at 20. Terrell established that "liability" for § 4 purposes means a showing of both an antitrust violation and fact of damage.[18] The term "fact of damage" can be likened to the causation element in a negligence cause of action. The term means simply that the antitrust violation caused injury to the antitrust plaintiff. To make this showing, however, an antitrust plaintiff need not prove that the violation was the sole cause of any alleged injury, but he does need to show that the violation was a material cause. Zenith Radio Corp. v. Hazeltine Research, 395 U.S. 100, 114 n.9, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969). This showing, of course, may not be based on speculation. Rather, the required causal link must be proved as a matter of fact and with a fair degree of certainty. Response of Carolina, Inc. v. Leasco Response, Inc., 537 F.2d 1307, 1321 (5th Cir. 1976); Terrell v. Household Goods Carriers' Bureau, 494 F.2d at 20.
 
 
 32
 This Circuit has also explained that the meaning of liability for antitrust purposes does not change simply because a trial is bifurcated under Fed.R.Civ.P. 42(b). In Response of Carolina, Inc. v. Leasco Response, Inc., 537 F.2d 1307 (5th Cir. 1976), this court stated that there was "no basis in law or logic to give liability different meanings depending upon the trial procedure used." Id. at 1321. The Leasco opinion explained that bifurcation in no way diminishes the requirement that a plaintiff show some evidence that a violation caused him injury before a defendant is found liable. Thus:
 
 
 33
 (I)f the trial is bifurcated between liability and damages, there must be some evidence showing a causal link between the violation and alleged injury in phase I, before plaintiff may enter phase II.
 
 Id.[19]
 
 34
 Just as the meaning of liability does not vary because a trial is bifurcated, the requisite proof also in no way hinges upon whether or not the action is brought on behalf of a class under Rule 23. It is axiomatic that a procedural rule cannot "abridge, enlarge, or modify any substantive right."[20] Consequently, this court has no power to define differently the substantive right of individual plaintiffs as compared to class plaintiffs.
 
 
 35
 C. Bifurcation Under Fed.R.Civ.P. 42(b).
 
 
 36
 According to Judge Varner, the certification of the national class rests largely on his authority to bifurcate the trial between the issues of liability and damages. Rule 42(b) allows a district court "in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy," to order a separate trial of any "claim, cross-claim, counter claim, or third-party claim, or of any separate issue or of any number of . . . issues" as long as the court preserves inviolate the right of trial by jury as declared by the Seventh Amendment or as given by a statute of the United States. This Court has approved bifurcation procedures on several occasions. However, this Court has cautioned that separation of issues is not the usual course that should be followed, and that the issue to be tried must be so distinct and separable from the others that a trial of it alone may be had without injustice. Swofford v. B & W, Inc., 336 F.2d 406, 415 (5th Cir. 1964). This limitation on the use of bifurcation is a recognition of the fact that inherent in the Seventh Amendment guarantee of a trial by jury[21] is the general right of a litigant to have only one jury pass on a common issue of fact. The Supreme Court recognized this principle in Gasoline Products Co., Inc. v. Champlin Refining Co., 283 U.S. 494, 51 S.Ct. 513, 75 L.Ed. 1188 (1931) wherein it held that no Seventh Amendment violation occurs when an appellate court orders a new trial on the issue of damages, but lets stand the original jury's findings on liability. The Court explained, however, that a partial new trial may not be "properly resorted to unless it clearly appears that the issue to be retried is so distinct and separable from the others that a trial of it alone may be had without injustice." Id. at 500, 51 S.Ct. at 515. Such a rule is dictated for the very practical reason that if separate juries are allowed to pass on issues involving overlapping legal and factual questions the verdicts rendered by each jury could be inconsistent.
 
 
 37
 In an antitrust action brought under the Clayton Act, it is most important to be aware of the Seventh Amendment limitations on a Rule 42(b) bifurcation. This awareness is important because liability under § 4 necessarily includes proof of injury to business and property. Therefore, bifurcation to separate juries of liability and damages in a § 4 case inevitably introduces the possibility that in the liability phase the first jury might find that there was such injury, while the second jury might on the same evidence of injury in the damage phase, find none.
 
 
 38
 It is exactly this possibility of disparate findings that prompted this Court to earlier say that "in a private antitrust suit there is no neat dividing line between the issue of liability and damages." Terrell v. Household Goods Carriers' Bureau, 494 F.2d 16, 21 (5th Cir. 1974). And, because of this vague dividing line between liability and damages, this Court has also cautioned that separate trials of liability and damages "must be approached with trepidation," Response of Carolina, Inc. v. Leasco Response, Inc., 537 F.2d at 1324, and the use of bifurcation "must be grounded upon a clear understanding between the court and counsel of the issue or issues involved in each phase and what proof will be required to pass from one phase to the next." Id.
 
 III. The National Class Certification
 
 39
 An analysis of the national class certification should begin by examining the district court's order. Judge Varner's "Order and Memorandum Opinion" deals initially with the requirements of 23(a). After establishing that these requirements have been satisfied,[22] the court then turns to the predominance and superiority requirements of 23(b)(3). As to the first of these requirements (that questions of law or fact predominate over any questions affecting only individual members), the district court begins by rejecting the defendants' argument that individual proof of injury and damages will be necessary as to each class member, and, therefore, common issues will not predominate. The court reasoned that:
 
 
 40
 Acceptance of this argument would effectively preclude the use of class actions in antitrust cases. It is too widely recognized to require citation that antitrust price-fixing cases are particularly suited for class action treatment in spite of the fact that the fact of injury and the amount of damages may require individual proof by class members. . . . Furthermore, the Court cannot share Defendants' viewpoint that the fact of injury, as distinct from the amount of damages, will not be susceptible of generalized proof. . . . It is the opinion of this Court that proof, that artificially high price levels prevailed in the national school bus market as a result of the conspiracy alleged herein will constitute proof of the fact of injury to the class of purchasers of such buses. . . . In the opinion of this Court, none of Defendants' other arguments on the issue of predominance of common questions is of sufficient weight to counterbalance the fact that the central and predominant issue herein is whether or not Defendants have acted to monopolize or restrain trade in school buses.
 
 
 41
 App. 166-167.
 
 
 42
 The contention of the defendants which the district court considered the "more serious" is whether the class action is the superior method to deal with this controversy, and, in particular, the question of manageability. The manageability problem envisioned by the district court was whether the certification of the nationwide class would "cause this court to be swamped with . . . hundreds of individual proceedings to determine the amount of individual damages suffered by individual class members." App. 168. The district court recognized that, in light of the variations in purchasing methods and other incidents of sale presented by the defendants, it may indeed be necessary to treat all or many damage claims individually. Thus, the court stated:
 
 
 43
 In the face of this possibility, it would be irresponsible for the Court to certify the classes herein, and especially the nationwide class, without first satisfying itself that there exists a mechanism for avoiding such a paralyzing development. Upon consideration, the Court has proposed that it can, without going beyond its statutory powers and without violating the constitutional and statutory rights of Defendants, bifurcate the trial of the matter, and, after a jury determination, if any, of the issue of liability of nation-wide Defendants in this Court, sever the cases of class members or groups of members separated geographically and transfer the severed cases to other district courts for trial of all remaining issues, which will be primarily or exclusively damage issues.
 
 
 44
 App. 169.
 
 
 45
 A reading of the district court's order seems to lead to the conclusion that the court intended to allow a nationwide class to exist only for a determination of the issue of liability. In fact, Judge Varner recognized that the national class would be totally unmanageable if he alone had to handle all the issues of the case. A review of the district court's order, therefore, must focus in on the propriety of the certification for this limited purpose, and then, if appropriate, examine the bifurcation, severance, and transfer plan proposed by Judge Varner.
 
 
 46
 Judge Varner certified the national class for a determination of "liability" after explaining that the question common to the class was the existence of an antitrust violation. App. 167. We stated earlier, however, that the issue of liability in antitrust cases includes not only the question of violation, but also the question of fact of injury, or impact. See Terrell v. Household Goods Carriers' Bureau, 494 F.2d 16, 20 (5th Cir. 1974). Therefore, for the certification of the national class to be upheld, we must determine whether the existence of the antitrust violation is a question common to all members of the class, and, if so, whether this question predominates over all other issues which affect only individual members of the class. In making the determination as to predominance, of utmost importance is whether "impact" should be considered an issue common to the class and subject to generalized proof, or whether it is instead an issue unique to each class member, and thus the type of question which might defeat the predominance requirement of 23(b)(3).A. The Antitrust Violation and the Requirement of a Question Common to the Class.
 
 
 47
 The district court's order finds that proof of the national conspiracy is a question common to the class.[23] Unfortunately, we are presently unable to agree with this conclusion because the little evidence that there is in the record as to how the plaintiffs intend to establish the conspiracy seems to indicate that proof of the conspiracy cannot be made in a manner common to all members of the class.
 
 
 48
 The evidence brought to our attention by the plaintiffs as to how they plan to establish this nationwide conspiracy was set forth in their brief and consists of a deposition of one of the Alabama distributors. According to the plaintiffs, this deposition is "substantial evidence that the manufacturers decide what price their distributor is to bid in any given situation." Brief of Appellees at 6. An examination of this deposition, however, reveals that it is evidence of nothing more than the fact that antitrust violations might have occurred in Alabama and several other southern states. The deposition in no way establishes a nationwide conspiracy. For example, the Alabama distributor gave the following response when asked about how he would seek "competitive allowances" from one of the manufacturers:
 
 
 49
 Q. And what would you tell (the manufacturer)?
 
 
 50
 A. Tell him I had an invitation to bid in such and such a county for five buses, what do you want me to do. I mean, are you going to help me on this bid, or do you know you know, I can't bid if you don't help me, you know. . . .
 
 
 51
 Q. All right. If he couldn't help you, then you just didn't bid at all?
 
 
 52
 A. I just couldn't bid or either just send a complimentary bid.
 
 
 53
 App. 70-71.
 
 
 54
 The distributor testified further that the manufacturer he dealt with had never given him a competitive allowance in Jefferson and Montgomery counties and that he had also never been the low bidder in those counties. The situation, however, was different in Mobile County where the distributor was the low bidder so long as he was given a competitive allowance. App. 42-43. As to the effect of this conspiracy on states outside of Alabama, the plaintiffs' only evidence consists of the following portion of a letter from the same Alabama distributor to his manufacturer:
 
 
 55
 With this thought in mind, I think the pending anti-trust suit in Alabama should be discussed. If this suit is filed, you can believe it will be against my company and Thomas Built Buses, Inc. What action do you plan to take from a local standpoint? There are many hidden factors concerning this type which should be discussed. I predict suits will eventually be filed in other southern states, such as Tennessee, Mississippi, and Louisiana. What policy does Thomas have concerning past regional sales managers in these areas? The present price situation in Alabama is largely due to price policies in North Carolina, South Carolina, and Florida, of which Thomas is a part.
 
 
 56
 Brief of Appellees at 7.
 
 
 57
 The district court's error in certifying this nationwide class for a determination of liability was in failing to take the steps necessary to determine the manner in which the plaintiffs proposed to prove the antitrust violation. No one questions that it is the plaintiffs who have the burden of establishing that all requirements of Rule 23 have been met, and in this case they have failed to prove to us that there are any common issues of law or fact which predominate over individual issues. The excerpts from the deposition of the Alabama distributor are probative only of the possibility of an Alabama conspiracy they in no way establish that a price fixing scheme was contemplated in California, New York, Idaho, etc. Of greater importance, however, is whether we are supposed to infer from this offer of proof by the plaintiffs that this is the manner in which they plan on establishing the nationwide conspiracy i.e. by an examination through testimony, exhibits, etc., of the various school bus markets on a state by state basis. If this is the situation, then we fail to see how common issues of fact predominate. Of course, it may very well be that if the plaintiffs had been allowed discovery as to this point they would have uncovered evidence which not only would have established a nationwide conspiracy, but evidence which at the same time would have been common to all members of the class. It may be that the plaintiffs have this evidence now. We only point out that in a situation wherein one seeks to represent a nationwide class in order to obtain redress for harm done from a nationwide conspiracy consideration should be given to whether the addition or subtraction of any of the plaintiffs to or from the class will have a substantial effect on the substance or quantity of evidence offered. If such addition or subtraction of plaintiffs does affect the substance or quantity of evidence offered, then the necessary common question might not be present.[24] This point limits somewhat the breadth of Judge Varner's statement that "antitrust price-fixing cases are particularly suitable for class action treatment." App. 166. While this statement is generally true, this particular litigation might not fit into the category of a "classic" antitrust price-fixing conspiracy where all legal and factual issues relating to the conspiracy are uniformly related to all those allegedly harmed. Rather, in this case neither the products involved nor the purchasers appear to be standardized. The plaintiffs' class includes different sizes of governmental buyers, operating under different conditions throughout the United States, and the products involved, while commonly known as school bus bodies, apparently differ in many respects and have been marketed under various arrangements at different times.[25] Because of these factors, the defendants contend that a common scheme to rotate bids, fix prices, etc., cannot be demonstrated as to all defendants. While we do not necessarily agree with this assessment, it does appear from the limited record before us that the plaintiffs plan to proceed state by state and prove by varying evidence fifty different price-fixing conspiracies. Possibly the plaintiffs think if they can prove that a conspiracy existed in every state, they can then term these different violations one nationwide conspiracy. If this is indeed the plaintiffs' plan, then the national class should not have been certified since there would be no evidence linking the different conspiracies to each other in order to establish the one "common" conspiracy.[26] Common issues of fact do not predominate in such a situation even though all the plaintiffs might have separate causes of actions against the same defendants based upon similar theories of recovery.
 
 
 58
 The Court, however, is presently unable to make the determination as to whether the conspiracy issue is a question common to the class. It would be unfair for us to make this determination based on the present state of the record since the plaintiffs have been placed at a severe disadvantage by the district court's decision to prohibit discovery. Consequently, a remand of this case is necessary, and, on remand, the plaintiffs should be afforded the opportunity to attempt to establish through appropriate discovery the proper predicate for class certification.
 
 
 59
 B. Proof of Impact and the Rule 23 Requirements
 
 
 60
 Assuming that at some point the district court finds that the conspiracy issue is a question common to the class, the court must then decide whether this question predominates over all other issues which affect only individual members of the class, and whether the class action is the superior method to deal with this controversy. As to the predominance issue, the district court has already explained that the question of damages is an individual question.[27] Also of great significance, however, is whether the question of "impact" is likewise a question unique to each member of the class. The district court was of the opinion that proof of impact as to each member of the plaintiffs' class could be made in a generalized manner, and that it would not be necessary at the trial on liability for each member of the plaintiffs' class to prove this factor on an individual basis. If the district court is correct on this point, then the conspiracy issue might well predominate over all other individual issues. But, if generalized proof of impact is in fact improper, then the district court must carefully consider whether this requirement of individual proof does not defeat the class certification on either predominance or manageability grounds.
 
 
 61
 The defendants admit that some price-fixing cases are suitable for class action treatment by virtue of their factual simplicity an unlawful overcharge with respect to a homogeneous or fungible product which was marketed in a similar manner throughout the country. In this type of situation, "impact" and "buyer" become almost synonymous, and, therefore, once the illegal overcharge as to the homogeneous products has been established, it is most reasonable to assume "injury" or "impact" upon a showing of proof of purchase. The defendants, of course, argue that this case is dramatically different from such an example. Because of the unique nature of the product and the different modes of purchase, the defendants assert that an individual examination involving each class member is required before a decision as to impact can be made. In effect, the defendants contend that no facet of the competitive situation in one state is relevant to the competitive situation in another state. The plaintiffs counter these arguments by citing a Second Circuit case which basically reiterates the defendants' example of those cases which are fit for class action treatment. In In re Master Key Antitrust Litigation, 528 F.2d 5 (2nd Cir. 1975), the Second Circuit stated:
 
 
 62
 If the appellees establish at the trial for liability that the defendants engaged in an unlawful national conspiracy which had the effect of stabilizing prices above competitive levels, and further establish the appellees were consumers of that product, we would think that the jury could reasonably conclude that appellants' conduct caused injury to each appellee.
 
 
 63
 Id. at 12 n. 11.
 
 
 64
 Several circuits have concerned themselves with the question of what type of proof is required in order to satisfy the "impact" issue. The above quote reflects the position taken by the Second Circuit in one particular case. Master Key involved an alleged conspiracy by four defendants (manufacturers of builders' hardware and lock and key systems) to fix prices and to eliminate inter-and intraband competition among their dealers. It is of course impossible for us to know whether the rather broad language used by the Second Circuit in its opinion means that proof of purchase will always satisfy the "impact" requirement in price-fixing cases once violation has been established.[28]
 
 
 65
 The Third Circuit has recently dealt with this problem of impact and class certification. In Bogosian v. Gulf Oil Corp., 561 F.2d 434 (3rd Cir. 1977), sixteen major oil companies were sued by two independent service station dealers who sought class certification "on behalf of all present and former lessee gasoline dealers of the defendants." The gravamen of the plaintiffs' complaint was that the defendants jointly imposed a system of lease arrangements which eliminated price competition among defendants on sales to independent dealer lessees.[29] The district court refused to certify the plaintiffs' class partly because the "fact of damage" element would have to be proven on an individual basis. The Third Circuit, however, reversed this decision, and in so doing dealt extensively with the "impact" problem. The court recognized that fact of damage is nothing more than the simple concept of causation, and that any evidence which is logically probative of a loss attributable to the violation will satisfy this element. The Court explained that:
 
 
 66
 There is absolutely no requirement that the loss be personal or unique to plaintiff, so long as the plaintiff has suffered loss in his business or property, for as we have noted, this second aspect of fact of damage is not concerned with any policy of limiting liability. Thus, when an antitrust violation impacts upon a class of persons who do have standing, there is no reason in doctrine why proof of the impact cannot be made on a common basis so long as the common proof adequately demonstrates some damage to each individual. Whether or not fact of damage can be proven on a common basis therefore depends upon the circumstances of each case.
 
 
 67
 Id. at 454.
 
 
 68
 The Bogosian Court felt that their position of allowing generalized proof of impact in certain situations was in no way at variance with the cases in other circuits,[30] and the Court did set forth some examples of those situations which it felt were appropriate for generalized proof of impact.[31] Ultimately, however, the Bogosian Court was unable to make a determination as to whether generalized proof of impact was proper in the case before it because neither the district court nor the parties had focused upon the factors which the Court considered determinative of that question.
 
 
 69
 Recently, the Fourth Circuit, sitting en banc, has had the opportunity to address the "impact" question. Windham v. American Brands, Inc., 565 F.2d 59 (4th Cir. 1977), deals with the attempts of growers of flue-cured tobacco in South Carolina to have certified as a class action their antitrust suit against various tobacco companies and the Secretary of Agriculture. The proposed class of South Carolina tobacco growers numbered approximately 20,000. The plaintiffs' complaint alleged that the tobacco manufacturers, with the knowledge and consent of the Secretary of Agriculture, conspired to fix prices and rig bids on flue-cured tobacco at the South Carolina tobacco auction markets, and also that these same defendants conspired to monopolize these auction markets by percentage purchase agreements and collusive bidding.
 
 
 70
 The Windham Court recognized initially that the "gravamen of the complaint is not the conspiracy; the crux of the action is injury, individual injury." Id. at 66. Furthermore, the Court noted that while a case may present a common question of violation, the issues of injury and damage remain the critical questions in antitrust cases and are always "strictly individualized." Id. The Windham Court did recognize the existence of an apparent conflict in authority regarding the impact question, and, in its affirmance of the district court's order denying class certification,[32] the Court dealt with this conflict by explaining:
 
 
 71
 This conflict in result among the decisions seems to reflect more a factual difference in the cases themselves than a difference over legal principles. Thus in cases where the fact of injury and damage breaks down in what may be characterized as "virtually a mechanical task," "capable of mathematical or formula calculation," the existence of individualized claims for damages seems to offer no barrier to class certification on grounds of manageability. On the other hand, where the issue of damages and impact does not lend itself to such a mechanical calculation, but requires "separate 'mini-trial(s)" of an overwhelming large number of individual claims, courts have found that the "staggering problems of logistics" thus created "make the damage aspect of (the) case predominate," and render the case unmanageable as a class action.
 
 
 72
 Id. at 68 (footnotes omitted).
 
 
 73
 We have noted earlier in this opinion that this Circuit places great importance on the "impact" element of an antitrust cause of action. In Shumate & Co., Inc. v. National Ass'n of Sec. Deal., Inc., 509 F.2d 147 (5th Cir. 1975), we stated that, "Whatever the nature of the alleged conspiracy . . . injury is the sine qua non for stating a cause of action." Id. at 152. We also explained that there could be no recovery of any amount of damage "where the jury could only speculate either as to its occurrence or as to its causal relationship to the anticompetitive activity."[33] Id. at 153.
 
 
 74
 This Court has not had the opportunity to deal extensively with exactly what type of proof will establish the impact element of an antitrust cause of action, and the effect this proof will have on class certification. The Shumate Court dealt briefly with the question when it refused to reverse a district court's denial of a class certification. This denial rested on the district court's conclusion that even if a conspiracy was established by the plaintiffs' class, "the controlling question as to liability was whether a class member had suffered injury." Id. at 155. Consequently, the district court decided that the "difficulties likely to be encountered in maintaining the case as class actions outweighed the benefits." Id. On appeal, this Court held:
 
 
 75
 This case is different from one where liability can be shown as to all class members, with only the amount of damage to be determined as to each. In this antitrust case the proof of injury to business or property of each class member is critical for the determination of defendants' liability to any individual. The district court was within its discretion in deciding that common questions of fact do not predominate. See F.R.Civ.P. 23(b)(3); Smith v. Denny's Restaurants, Inc., 62 F.R.D. 459 (N.D.Cal.1974); Kinzler v. New York Stock Exchange, 62 F.R.D. 196 (S.D.N.Y.1974); Gneiting v. Taggares, 62 F.R.D. 405 (D.Idaho 1973).
 
 
 76
 Id.
 
 
 77
 The holding in Shumate affirming the district court's denial of a class certification is a recognition by this Court that the fact that a case is proceeding as a class action does not in any way alter the substantive proof required to prove up a claim for relief. The holding is also a recognition that "impact" is a question unique to each particular plaintiff and one that must be proved with certainty. That does not mean of course that cases do not exist wherein this requirement of certainty cannot be established by some sort of classwide proof.[34] But it does mean that cases do exist wherein generalized proof of impact would be improper. Let us assume, for example, that in the case before us the plaintiffs can establish the nationwide conspiracy by some sort of common proof i. e. the plaintiffs uncover some memoranda between the presidents of the school bus companies which discussed "fixing prices nationwide." Given such a situation, each plaintiff must still prove that this conspiracy was actually implemented in his state and that it did in fact cause him injury. This proof of injury in a price-fixing case will generally consist of some showing by the plaintiff that, as a result of this conspiracy, he had to pay supracompetitive prices for school buses. If there was some uniformity in the quality and price of a school bus, then this requirement of "impact" might cause few problems.[35] But, given the diverse nature of the school bus market, we have difficulty envisioning how the plaintiffs can prove in a manageable manner that the conspiracy was indeed implemented in a particular geographical area, and that it did in fact cause damage.[36] More specifically, we do not understand how the plaintiffs can make this proof without examining the relevant school bus market where each individual plaintiff is located. If such particularized proof is necessary, then it would seem to us that each individual plaintiff's claim would receive more thorough consideration in individually litigated actions.[37] Also, and equally important, is the fact that if the effect of class certification is to bring in thousands of possible claimants whose presence will in actuality require a multitude of mini-trials (a procedure which will be tremendously time consuming and costly), then the justification for class certification is absent.
 
 
 78
 We are not attempting, however, to hold as a matter of law that the impact requirement in the case before us defeats any possibility of a class certification. It may be that the defendants' description of the school bus industry is inaccurate or that the plaintiffs can figure out some way to show impact as to each member of the plaintiffs' class without having to resort to lengthy individualized examinations. We have, however, attempted to emphasize the importance of this element of an antitrust cause of action, and to illustrate how this element is closely intertwined with the determinations which must be made before certifying a class under Rule 23.
 
 C. Other Concerns
 
 79
 In the recent case of Krehl v. Baskin-Robbins Ice Cream Co., 78 F.R.D. 108 (C.D.Calif.1978), the district court stated:
 
 
 80
 The only instances in which courts have refused to certify price-fixing cases are those in which proof of the conspiracy as to numerous defendants cannot be accomplished on a classwide basis . . . or when proof of fact of damage would be unmanageable because of the intricate nature of the market or the number of potential plaintiffs. See Windham v. American Brands, Inc., supra, (sales of flue-cured tobacco at 36 different auction centers with fluctuating price of commodity and complex variable grading system unmanageable); In re Hotel Telephone Charges, supra, (class of plaintiffs 40 million).
 
 
 81
 Id. at 121. Up till now, this opinion has focused in on the problems recognized by the Baskin-Robbins court. There are, however, several other areas which concern both the parties and this court.
 
 
 82
 For example, the only mention by us of the "manageability" problem has been with regard to whether proof of impact can be made in a manageable manner. However, we are also very concerned with the propriety of the plan devised by the district court in order to deal with the damage issues. Obviously, if the implementation of this "bifurcation, severance and transfer" scheme is improper, then the national class should not have been certified given the district court's concession that the class would be unmanageable if all damage questions had to be resolved in one forum. Unfortunately, with the record in its present state, it is impossible for us to determine whether the issues of liability and damages in this case are so interwoven that it would be violative of the Seventh Amendment to enter a bifurcation order. Consequently, there is little else that we can presently do other than to set forth the relevant law and to emphasize to the trial court the need to proceed with extreme caution in this area.
 
 
 83
 The defendants are also very concerned about the authority of the district court to sever the various claims of the class members, and then to transfer these claims to different forums pursuant to 28 U.S.C. § 1404(a). The defendants contend that § 1404(a) was never intended to be used as a method by which a trial court could procreate new litigation in a multitude of district courts throughout the country. They argue that the language in the statute which provides for the district court to transfer "any civil action" means that the transfer must encompass the entire civil action not severed parts of one action.
 
 
 84
 We do not feel it necessary at this time to reach the merits of the defendants' arguments. While we are concerned with whether the district court has the authority to make such transfers, we are even more concerned with whether any class action can be considered "manageable" within the meaning of Rule 23 if a plan which resembles judicial fission is needed in order to make it so. There is precedent in other circuits for the proposition that a class action should be considered unmanageable when the determinations of damages cannot be made by "mathematical or formula computations." See, e. g., Windham v. American Brands, Inc., 565 F.2d 59, 68 (4th Cir. 1977). While we do not adopt such a position, we do have serious reservations about the manageability of a class when such a widespread transfer plan is needed in order to resolve the admittedly difficult issue of individual damages.[38]
 
 IV. The State Class Certification
 
 85
 No useful purpose would be served by setting forth a parallel discussion of Rule 23 and its requirements as to the state class certification. Many of the problems are the same although to a much lesser degree.[39] Drastically reduced numbers are involved and the state distributors are named parties. There is no contemplated distribution of issues or claims Judge Varner will be dealing with all claims from start to finish. Should multiple individual claims require separate proof of impact or damage, such proof will be presented in the same district court.[40] Nevertheless, the predominance, superiority, and other elements must be dealt with on a continuing basis.
 
 
 86
 The learned trial judge has demonstrated a keen awareness of both the advantages and difficulties of Rule 23. This judicial tool specifically provides for continuing review with later certification of additional classes, creation of sub-classes, or decertification. We do not feel there has been an abuse of discretion as to the state class certification, and we, therefore, affirm that action.V. Conclusion
 
 
 87
 The order of the district court certifying the national class is reversed and the cause remanded for further proceedings consistent with this opinion.
 
 
 88
 The order of the district court certifying the state class is affirmed.
 
 
 89
 AFFIRMED IN PART, REVERSED IN PART AND REMANDED.
 
 
 
 *
 James Lawrence King, United States District Judge for the Southern District of Florida, sitting by designation
 
 
 [1]
 Plaintiffs' Amended Complaint (A. 93) alleges that Blue Bird Body Company, Carpenter Body Works, Inc., Superior Coach Corporation (and its acquiring corporation, Sheller-Globe Corporation), Thomas Built Buses, Inc., Wayne Corporation, and Ward School Bus Manufacturing Inc. are "manufacturer defendants."
 
 
 [2]
 Everett Equipment Company, Inc., Phillips Supply Co., Eddins Bus Sales, Inc., Carpenter Bus Sales of Alabama, Waits Sales & Equipment Co., Inc., Duncan Manufacturing and Equipment Co., Inc., and Alabama Bus Company are alleged to be "distributor defendants" A. 93
 
 
 [3]
 These acts by the defendants were allegedly done in violation of Section 1 of the Sherman Act 15 U.S.C. § 1
 
 
 [4]
 In reality, the national claim is asserted on behalf of all governmental entities in the United States except for those governmental entities in the State of Georgia. Georgia is excluded because a separate lawsuit involving these same manufacturers and Georgia distributors had been previously brought in Georgia. In that case, a settlement was reached after the district court for the Northern District of Georgia refused to certify a statewide class
 
 
 [5]
 In the same order certifying the two plaintiff classes, the district judge also certified his orders for immediate appeal pursuant to 28 U.S.C. § 1292(b). In so doing, Judge Varner stated that the "certification of plaintiff classes herein involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation." A. 177. On September 8, 1976, this Court granted the defendants' petition for review. On appeal, the plaintiffs argue that only the propriety of the "national class" certification is at issue, and that this Court does not have before it the propriety of the state class certification. Our reading of the § 1292(b) certification differs from that of the plaintiffs', and we feel that both class certifications are subject to review
 
 
 [6]
 Fed.R.Civ.P. 42(b) provides in part:
 The court . . . may order a separate trial of any claim, cross-claim, counterclaim, or third-party claim, or of any separate issue or of any number of claims, cross-claims, counterclaims, third-party claims, or issues . . . .
 
 
 [7]
 This severance and transfer would, of course, be necessary only if the initial jury found against the manufacturers on the liability issue
 
 
 [8]
 At the outset, we want to recognize that the information in the record before us regarding the school bus industry was provided solely by the manufacturers. The plaintiffs were not allowed discovery on any issues other than venue, and, as a result, were not in the most advantageous position to offer a rebuttal to the manufacturers' description of the industry
 
 
 [9]
 As an example of the "unique" character of a school bus, the defendants set forth a summary of the body and equipment price list of Ward School Bus Manufacturing, Inc. In 1971, Ward manufactured ten "conventional" school bus bodies varying in length from 15'9 to 33'9 , and carrying from 24 to 78 passengers. Several forward control models (a bus with a forward mounted engine in the body) were offered varying in length from 28'5 to 38'10 and carrying from 60 to 84 passengers. Four pusher models (with the motor in the rear) were also offered, and these ranged in length from 30'5 to 37'2 and carried from 61 to 79 passengers. The basic list price, from the smallest of these models to the largest, more than doubled
 The index to Ward's body and equipment price list contains over 50 categories of equipment to be selected for use on any given bus. According to the defendants, one of the most important components of a bus is its seats. These differ significantly as to their type, size, back height, head support, padding, railing, upholstery, and seat belt assemblies. Ward's equipment and price list offers a number of variables with respect to school bus seating, and within each variable there are additional purchase alternatives, each of which significantly affects the final cost of the vehicle. Ward school bus seats are available in three types "school bus," "headrest," and "recliner", and each type comes in a variety of widths. App. 244.
 The "school bus" type seat comes in three models and the "headrest" type in two. Each model may be fitted with various options. For example, the following options, among others, are available on the "school bus" model: (1) a choice of 12 upholstery colors in three weights; (2) stitched backs at an additional cost of $10.00 per seat; and (3) padded "safety" seats for $16.00 to $24.00 each. The addition of armrests on the "headrest" model adds over $8.00 per seat, and heavier weight upholstery further increases the price. Reinforced frames add even more to the cost. Thirty-five variously priced miscellaneous equipment items may be added to any of these seats including stainless steal seat frames at $66.67 each, shoulder harnesses and seat belts at $20.00 per passenger, and padded seat rails and backs at $24.00 per seat.
 These seating alternatives have a considerable impact on the ultimate price of the vehicle. Assume, for example, that the base price of a 60-passenger (20 seat) school bus is $4,400.00 and that it is outfitted with "school bus" type seats with padded safety seats ($24.00 each), stainless steel frames ($66.67 each), and shoulder harnesses and seat belts ($20.00 per passenger). Seats of this type would add $3,013.00 to the price of the bus or 70% Over its base price. App. 245.
 The type of climate control equipment installed on a school bus depends upon the area of the country where it will be operated. Numerous options are available. Air conditioning, according to the equipment price list, costs $5,500 to $6,000 per bus while an auxiliary heater is priced at approximately $170.00 and a booster for that unit is another $115.00. In addition to eleven other variously priced options for the heating system, purchasers can have copper tubing installed at an additional cost of $60.00 to $200.00. Defroster fans cost $25.00, and power vent fans are available at $83.84.
 As further examples, Ward school buses differ with respect to their windows and visibility systems. Twelve different inside mirror assemblies are available and twenty-one separate outside mirror configurations. Entry and exit doors and door controls were available in fifteen designs, and emergency doors, controls, and hardware can be provided in 25 various assemblies. School buses designed to transport the handicapped are equipped with hydraulic lifts, special service doors, fastening devices for wheelchairs in lieu of seats, grab handles, and wider aisles. Seating configurations must, of course, be altered to accommodate the invalid equipment. A school bus outfitted for invalid transportation may cost $2,200.00 more than a basic bus.
 In addition to all of the above, many options are available with respect to bumpers, undercoating, fenders, fire extinguishers, first aid kits, floor coverings, headroom, paint, rails, signs, fire axes, toolboxes, and ventilators. App. 246.
 
 
 [10]
 There are a number of ways in which school buses are purchased. One method is to purchase a complete bus from a distributor of a body manufacturer. Another is to purchase a complete bus from a dealer of a chassis manufacturer such as General Motors. A purchaser might also buy a bus body from one distributor and the chassis from a dealer. App. 247
 
 
 [11]
 According to the defendants, a little less than one-half of the states utilize this purchasing method. App. 247
 
 
 [12]
 There are differences in the ways in which bids are invited or solicited in those states which require school bus purchases to be made on a competitive bid basis. Many states provide that bids may be solicited only from sellers listed on a master register prepared by the purchasing agency or a division of the state government. Some states require that invitations be sent to all sellers listed on the register while others authorize the purchaser to select which of the listed sellers he wants to invite to bid. In several states, sellers may bid on a purchase by making application to the purchaser, in others, the bidders are selected on the basis of the purchaser's recognition of the seller's reputation, and in still others, no direct notice is given and advertisement of the bid solicitation is posted in the public place or published in a newspaper
 The defendants contend that these variations are important because they affect which sellers will be permitted to bid for the sale of a school bus. Where the purchasing agency has discretion to select the bidders, the same bidders may not be selected to bid on each bus. Conversely, it is possible that the same sellers will always be selected to the detriment of the excluded sellers. The point being that in many cases the sellers have no control over who will submit bids because the law vests the purchasing agency with the authority and discretion to decide who shall bid and who shall not.
 
 
 [13]
 The three states the defendants are referring to are New Hampshire, New Jersey, and West Virginia
 
 
 [14]
 The "national" claim, however, does include the additional allegations against the manufacturers that they monopolized or attempted to monopolize "the trade or commerce in school bus bodies in the several states." App. 99
 
 
 [15]
 For example, the Advisory Committee note stated that a fraud perpetuated on numerous persons by the use of similar misrepresentations may be an appealing situation for a class action, and it may remain so despite the need, if liability is found, for separate determinations of the damages suffered by individuals within the class. However, the note also explained that a fraud case, although having some common core, may be unsuited for treatment as a class action if there were material variations in the representations made or in the kinds or degrees of reliance by the persons to whom they were addressed. The note then gave as a second example the "mass accident" situation which results in injuries to numerous persons. This type of case "is ordinarily not appropriate for a class action because of the likelihood that significant questions, not only of damages but of liability and defenses to liability, would be present, affecting the individuals in different ways. In these circumstances an action conducted as a 'class action' would degenerate in practice into multiple lawsuits" affecting the individuals in different ways. Fed.R.Civ.P. 23, Advisory Committee Note (1966)
 
 
 [16]
 Other per se violations are tying arrangements, Fortner Enterprises, Inc. v. United States Steel Corp., 394 U.S. 495, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969); division of markets, Timken Roller Bearing Co. v. United States, 341 U.S. 593, 71 S.Ct. 971, 95 L.Ed. 1199 (1951); group boycotts, Fashion Originators' Guild v. FTC, 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941), and resale price maintenance, United States v. Parke, Davis and Co., 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960)
 
 
 [17]
 An example of the importance of this distinction would be a conspiracy to establish maximum prices. This form of price-fixing would clearly violate the Sherman Act, see, e. g., Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc., 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219 (1951), but would not be a cognizable action under § 4 on behalf of retail customers because they most likely would not have suffered injury as a result of such acts
 
 
 [18]
 The "fact of damage" element is sometimes referred to as "impact" or "causal link"
 
 
 [19]
 As we shall see later, the problem presented by this case is not whether the plaintiffs are required to show "impact" in a bifurated trial even they concede that they must but rather the more difficult question is exactly what amount and quality of evidence satisfies this requirement
 
 
 [20]
 28 U.S.C. § 2072 is the enabling legislation which empowers the Supreme Court to promulgate rules prescribing "the forms of process, writs, pleadings, and motions, and the practice and procedure of the district courts and the courts of appeals of the United States in civil actions. . . ." § 2072 specifically provides that:
 Such rules shall not abridge, enlarge, or modify any substantive right and shall preserve the right of trial by jury as at common law and as declared by the Seventh Amendment to the Constitution.
 Id. See Windham v. American Brands Inc., 565 F.2d 59, 66 (4th Cir. 1977).
 
 
 [21]
 The Seventh Amendment provides in full:
 In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law.
 
 
 [22]
 Nothing has been brought to our attention by the defendants to cause us to disagree with the district court's findings as to 23(a). The pertinent part of the district courts' opinion provides:
 The first prerequisite to a class action enumerated in Rule 23(a) is that the proposed class must be so numerous that joinder of all members is impracticable. It is not seriously disputed that both the statewide and the nation-wide classes proposed herein meet this requirement. It is believed that the statewide class contains about 126 members and the nation-wide class in excess of 16,000. It is also clear that, while questions not common to all may arise, there are common questions of law or fact herein as required by the second enumerated prerequisite. The most obvious of these questions is the very existence of a conspiracy among the Defendants.
 Defendants' principal arguments concerning the requirements of Rule 23(a) are addressed to those of typicality of the claims of representative parties and fairness and adequacy of representation of the class by the named Plaintiffs. Defendants contend that the allegations of the "Second Claim" of the amended complaint, which is the claim as to which a nation-wide Plaintiff class is sought, show that the interests of the class Plaintiffs would be in conflict one with another. Specifically, they refer to § 42(c) of the amended complaint:
 "(c) The price range fixed each year within the State of Alabama and within other States by defendants has consistently exceeded the prices at which buses manufactured by the manufacturer defendants have been sold to certain favored public agencies outside the State of Alabama."
 This allegation is substantially like § 31(c) of the amended complaint (pertaining to the first claim (statewide class)), which was included in the original complaint. Defendants claim that the inclusion of this allegation illustrates the fact that this is basically a State of Alabama lawsuit to which the national class allegations were added as an afterthought. They further say that § 42(c) shows that some of the purported Plaintiffs have actually been favored by the alleged conspiracy and, thus, that a general class consisting of purchasers in all States would be inappropriate. This Court does not agree that any showing of conflict has been made. The fact that some school bus prices in Alabama may have been higher than some prices in other States does not necessarily or even reasonably create an inference that any purchasers of school buses have benefited from the alleged conspiracy. Plaintiffs have not alleged that school bus prices in other States were depressed below the free market level by the actions of Defendants. The Court does not consider it reasonable to suppose that Defendants are alleged to have entered into a conspiracy to raise prices in certain areas while artificially lowering them below free market level in other areas. It seems to this Court that all or substantially all class members have the same interest in recovering damages for any such conspiracy, if any, as may be found to have existed. Their interests will differ in degree, perhaps, but not in nature.
 This Court has been assured by Plaintiffs' attorney that they stand ready to advance costs for notices which may be required to all or certain class members.
 In addition, it remains within the power of the Court to create subclasses or to restrict the classes if it appears to be advisable at a later stage. For the present, no conflict between the claims and interests of the named Plaintiffs and those of the proposed classes has been shown. This Court finds that the claims of representative Plaintiffs are typical of those of the proposed classes and that the representative Plaintiffs have the capacity and willingness fairly, adequately and effectively to prosecute this action in their behalf. The Court, thus, concludes that the requirements of Rule 23(a) are met in this matter.
 App. 164-166.
 
 
 [23]
 Judge Varner stated that "the central and predominant issue herein is whether or not defendants have acted to monopolize or restrain trade in school buses." App. 167
 
 
 [24]
 This point was discussed in the panel decision in Windham v. American Brands, Inc., 539 F.2d 1016 (4th Cir. 1976), rev'd en banc, 565 F.2d 59 (4th Cir. 1977). Judge Wyzanski, sitting by designation, observed:
 But the findings do not address the question whether, if the sole issue before a court and jury were the existence of alleged conspiracies which constituted violations of the anti-trust laws, there would be a substantial difference in the quantum or character of the requisite proof if the plaintiffs included all 20,000 in a class action or only the six named plaintiffs.
 539 F.2d at 1018-1019.
 
 
 [25]
 From the record that is before us, we feel that this case presents certification problems which are similar in nature to those confronted by the district courts in Chestnut Fleet Rentals, Inc. v. Hertz Corp., 72 F.R.D. 541 (E.D.Pa.1976), and In re Transit Company Tire Antitrust Litigation, 67 F.R.D. 59 (W.D.Mo.1975). In Chestnut Fleet, a class action certification was sought in an antitrust case by all automobile rental firms against the three largest rental firms. The plaintiffs were alleging an illegal foreclosure of the market, monopolization, and price-fixing. One of the reasons cited by the district court for its denial of class certification was a lack of predominance. In so ruling, the court stated:
 In this case, the market is heterogeneous and fragmented. Each airport presents a different factual and legal problem because each is subject to different state or local operating rules, ordinances, and regulations. The competitive situation at airport A in state A is likely to be quite different from airport B in state B. Even within the same state, the airports may be regulated and operated in a different fashion by different municipalities. Thus, to establish liability under the antitrust laws, plaintiffs must necessarily proceed with proof on an airport-by-airport basis since each presents a unique competitive environment. While sub-classes or issues may be certified separately under 23(c)(4)(A) and (B), we conclude that the highly diverse nature of the market effectively thwarts sharp definitions of subclasses and there is no predominate common issue which can be effectively severed for separate class treatment.
 
 
 [72]
 F.R.D. at 548. In In re Transit Company Tire Antitrust Litigation, bus operators brought an antitrust action against five manufacturers of "Special Mileage Commercial Tires" and sought class action certification. The plaintiffs sought to represent a class of persons consisting of all transit companies, bus companies or transit authorities within any state or territory of the United States, the District of Columbia, or the commonwealth of Puerto Rico who have leased special mileage commercial tires from any of the named defendants. This class consisted of approximately 750 entities, and the antitrust violations allegedly committed against this class by the defendants include unlawful market allocations, price-fixing, and monopolization. In denying class certification, the district court stated:
 Because of the numerous differences which may have arisen in the dealings between class members and one or more of the defendants, it is unlikely that plaintiffs can establish these allegations by facts which are common to all class members. Proof of the factual allegations of the complaints concerning violation and injury will necessarily vary from transit company to transit company, as it does not necessarily follow that proof of the factual allegations as to one plaintiff will establish that fact as to other plaintiffs and class members. Because of the presence of five different defendants, approximately 1400 leasing arrangements, and a period of time of at least twenty years, it is possible that the defendants may not have acted uniformly with respect to all class members. In addition to the individual issues of fact which are likely to arise on proof of liability on behalf of the class, it is clear from the pleadings in these suits that defendants will attempt to establish various facts in defense of the claims which pertain only to individual class members. . . . In summary, the files, records, and evidence received in these suits discloses that the determination of the issue of liability alone would more than likely involve significantly different evidence and factual determinations as to each of the approximately 750 class members.
 Plaintiffs' argument that the common questions of law and fact herein are the questions going to the alleged conspiracy to restrain trade, lessen competition, to attempt to monopolize and to monopolize ignores the proper determinations which must be made on a request to maintain a Rule 23(b)(3) class action. Rule 23 requires more than a consideration of commonality in the ultimate questions of law or fact; it requires close consideration of the separate questions of law or fact which determine those ultimate issues.
 
 
 [67]
 F.R.D. at 73-74. (emphasis added)
 
 
 [26]
 In reality, we do not believe that the plaintiffs would pursue this national class action unless they were able to uncover direct evidence of one national conspiracy. We recognize that the plaintiffs were seriously handicapped in their efforts to show a common question by the district court's decision to restrict discovery, and, as a result, we could not realistically expect a better proffer of their proposed evidence and theories of recovery. Of course, we may be wrong, and the plaintiffs may feel that if they can prove fifty similar conspiracies then we should infer from this proof one nationwide conspiracy. While we recognize that there may be some merit in this position, we do not think it aids the plaintiffs in their desire to have the national class certified. The manageability problems involved in establishing these conspiracies in all fifty states clearly outweigh any benefit to be gained from certification of the national class
 
 
 [27]
 The district court stated:
 However, it seems equally probable to the Court that, in view of the variations in purchasing methods and other incidents of sale presented by defendants, it may indeed be necessary to treat all or many damage claims individually.
 App. 9-10.
 
 
 [28]
 It may be that the Master Key litigation was as factually complex as the case before us it is difficult to tell from a reading of the district and appellate court opinions. The previously cited quote from footnote 11 in Master Key was, however, made in response to the following argument by the defendants:
 The gist of appellants' argument is that the certifications of the class actions will prejudice their defense at the trial on liability by allowing appellees to substitute proof of generalized harm for what appellants believe to be the statutory requirement of proof of particularized injury. They argue that each appellee must prove that the impact of the alleged conspiracy reached to and injured them as 'eventual' or 'final' consumers of the builders' hardware and master key systems, another way of arguing perhaps that appellees lack standing to sue.
 528 F.2d at 11. At first glance, the Court appeared to refuse to reach the merits of this argument when it stated that it would involve consideration of matters which are crucial to the merits of the underlying dispute and which would therefore not be a matter "which can properly be before us as a collateral issue for interlocutory appeal." Although the court did decide the case on this procedural point, it nevertheless did add footnote 11 with its insight on what is required to establish impact.
 
 
 [29]
 More specifically, plaintiffs alleged that since 1957 defendants required all dealers who lease or sublease the defendants' service stations to sell only the lessor's gasoline and not to sell gasoline purchased from any other source under the licensed trademark. According to the plaintiffs, such an arrangement is a tie-in which violates § 1 of the Sherman Act
 
 
 [30]
 The Court stated:
 Our conclusion is not at variance with recent cases in other circuits indicating that fact of damage could not be proven on a class basis, since those cases turned upon their individual facts, rather than upon a rule of law precluding common proof of fact of damage. See, e. g., Shumate & Co., Inc. v. National Association of Securities Dealers, Inc., 509 F.2d 147, 155 (5th Cir.) cert. denied, 423 U.S. 868, 96 S.Ct. 131, 46 L.Ed.2d 97 (1975); In re Hotel Telephone Charges, 500 F.2d 86, 89 (9th Cir. 1974). On the other hand, it has been recognized that fact of damage can be proven on a common basis. See, e. g., City of Philadelphia v. American Oil Co., 53 F.R.D. 45, 60, 67-68 (D.N.J.1971); In re Antibiotic Antitrust Actions, 333 F.Supp. 278, 281, 287 (S.D.N.Y.1971); Developments, Class ACtions, 89 Harv.L.Rev. 1318, 1513 n. 301. See generally Wall Products Co. v. National Gypsum Co., 326 F.Supp. 295, 327 (N.D.Cal.1971).
 561 F.2d at 455.
 
 
 [31]
 As an example of those situations which might be subject to generalized proof of impact, the Court explained that:
 (I)f anticompetitive practices result in the destruction of plaintiff's business, he may recover as damages lost profits or the going concern value of the business. See Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969). If, however, defendants supply an article at supracompetitive prices, plaintiff may recover the amount of the illegal overcharge. See Hanover Shoe, Inc. v. United Shoe Machinery Corp., 392 U.S. 481, 487-90, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968). When plaintiff elects to prove damages on the basis of lost profits or going concern value, it would seem that his proof necessarily would focus on the operation of his business. But, if plaintiff seeks to establish payment of an illegal overcharge, the nature of proof may well be different.
 The Court also speculated as to how the plaintiffs could establish that generalized proof of impact was proper. The Court explained that:
 If, in this case, a nationwide conspiracy is proven, the result of which was to increase prices to a class of plaintiffs beyond the prices which would obtain in a competitive regime, an individual plaintiff could prove fact of damage simply by proving that the free market prices would be lower than the prices paid and that he made some purchases at the higher price. If the price structure in the industry is such that nationwide the conspiratorially affected prices at the wholesale level fluctuated within a range which, though different in different regions, was higher in all regions than the range which would have existed in all regions under competitive conditions, it would be clear that all members of the class suffered some damage, notwithstanding that there would be variations among all dealers as to the extent of their damage. "(The) burden of proving the fact of damage under § 4 of the Clayton Act is satisfied by . . . proof of some damage flowing from the unlawful conspiracy. . . ." Zenith Radio, supra, 395 U.S. at 114, 89 S.Ct. at 1571 n. 9. Under these circumstances, proof on a common basis would be appropriate. Even if the variation in price dynamics among regions or marketing areas were such that in certain areas the free market price would be no lower than the conspiratorially affected price, it might be possible to designate subclasses to conform with these variations. See In re Antibiotic Antitrust Actions, supra, 333 F.Supp. at 281.
 Id.
 
 
 [32]
 The en banc Court reached the same conclusions about class certification as did the district court. This conclusion was basically that:
 In view of the overwhelming nature of the individual claims and their complexity, (the district court) found, as we have said, that the issue of violation did not predominate nor was a class action a superior method.
 Id. at 67. The district court had reached this conclusion based on:
 (T)he multiplicity of claimants who might be involved, the complexity of their claims as they would relate to injury and damages, and the highly individualized character the proof of injury and damages would assume, making necessary a mini-trial in all the individual claims, probably with a separate jury. (The district judge) noted the numerous potential parties that might be injected into the action by class certification. Parties to whom notice would have to be given if class certification were allowed would, it seems, be above 20,000. The sheer cost of preparing a list of these potential parties was estimated at $30,000. The claims of the parties would involve thousands upon thousands of sales during four separate annual marketing seasons. Moreover, the claims could not be proved by any set method of mathematical or formula calculation but would require individual proof and trial, necessitating the examination of countless invoices, warehouse records, etc. In some cases, the calculation might be complicated, the district judge found, by the need to allow off-sets against the claims. This problem is also increased not simply by the necessity of individual proof and calculation but also by the variety of claims as asserted by the various plaintiffs themselves arising out of the several violations alleged by the plaintiffs.
 Id.
 
 
 [33]
 This particular point that fact of damage must be proven with certainty was earlier made by the Supreme Court in Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544 (1931), wherein the Court stated:
 (T)here is a clear distinction between the measure of proof necessary to establish the fact that petitioner had sustained some damage and the measure of proof necessary to enable the jury to fix the amount. The rule which precludes recovery of uncertain damages applies to such as are not the certain result of the wrong, not to those damages which are definitely attributable to the wrong and only uncertain in respect of their amount.
 Id. at 562, 51 S.Ct. at 250.
 
 
 [34]
 In a price-fixing case, it would seem that this classwide proof would have to be coupled with or it may consist entirely of proof of purchase
 
 
 [35]
 If all school buses were of similar quality and were marketed in a similar manner, it would not be that difficult to figure out what the competitive price of such a bus would be. Given this competitive price, impact could easily be established merely by a plaintiff showing that the purchase price of his particular bus exceeded the competitive price. In such a situation, damages could also be easily calculated
 
 
 [36]
 This is partly because it would be most difficult, if not impossible, to establish any sort of "competitive" price because of the variety of bus models and the various marketing schemes
 
 
 [37]
 This is particularly true in those cases where individual plaintiffs are financially able to prosecute individual actions. In our case, there is every indication that it would be financially reasonable for the plaintiffs to pursue their own individual remedies
 
 
 [38]
 One final point raised by the defendants concerns the role of the distributors in this cause of action. There are over four hundred local distributors of school bus bodies throughout the country and none of these distributors have been added as defendants in the "national" claim. By adding the Alabama distributors as defendants in the state claim, the Alabama plaintiffs seem to have admitted that they believe these distributors played a role in the Alabama conspiracy. The defendants assert that Judge Varner's order as to the national claim contemplates the addition of all local distributors as defendants at the local trials on damages (after transfer). Brief of Appellants at 35. If this is true, then the obvious question is how the finding of liability on the nationwide conspiracy claim will be treated as to those distributors. On the record before us, it is impossible to tell what role, if any, Judge Varner envisions those distributors will play in the transferee courts, but we think it is clear that any findings as to liability made in the absence of those distributors will not be binding upon them
 
 
 [39]
 Many of the problems raised by the defendants as to the certification of the national class fortunately do not exist with regards to the state class. These problems include such things as the propriety of the bifurcation and transfer plan and what role the nationwide distributors will eventually play
 
 
 [40]
 We would be remiss if we did not admit that we are much more impressed by the district court's finding of manageability of the state class than with his similar finding as to the national class. We feel that a district judge's finding of manageability in a situation wherein that judge is going to see the case through from beginning to end carries more weight than when a judge decides to bifurcate and sever the class and then to transfer the thousands of severed claims all over the country