In re PLYWOOD ANTITRUST LITIGATION.

FRENCH QUARTER APARTMENTS, LTD., et al., Plaintiffs-Appellants,

v.

GEORGIA–PACIFIC CORPORATION, et al., Defendants-Appellees.

GEORGIA–PACIFIC CORPORATION, Defendant-Appellant,

v.

KOHN, SAVETT, MARION & GRAF, P. C., et al., Movants-Appellees.

WILLAMETTE INDUSTRIES, INC., Defendant-Appellant,

v.

KOHN, SAVETT, MARION & GRAF, P. C., et al., Movants-Appellees.

LYMAN LAMB CO., et al., Plaintiffs-Appellees,

v.

GEORGIA–PACIFIC CORPORATION, et al., Defendants-Appellants.

Nos. 80–3234 to 80–3237.

United States Court of Appeals, Fifth Circuit. Unit A

Sept. 8, 1981.

Rehearing and Rehearing En Banc Denied Nov. 3, 1981 in No. 80–3237. Rehearing Denied Nov. 4, 1981 in No. 80–3234.

Frank Gregory, Tulsa, Okl., for appellant in 80–3234.

Hammond E. Chaffetz, Fred H. Bartlit, Jr., James H. Schink, Steven D. McCormick, Bruce Featherstone, John M. Felzan, Chicago, Ill., for Georgia-Pacific Corp.

Charles W. Lane, III, New Orleans, La., for Weyerhaeuser.

Robert H. Bork, New Haven, Conn., for all defendants-appellees.

Gene W. Lafitte, New Orleans, La., for Willamette Industries.

Kohn, Savett, Marion & Graf, Harold E. Kohn, Wayne M. Thomas, Philadelphia, Pa., Herbert J. Garon, Jacques F. Bezou, New Orleans, La., Joseph D. Tydings, Dale E. Fredericks, Sedgwick, Detert, Moran & Arnold, San Francisco, Cal., Joel C. Meredith, Philadelphia, Pa., Edward W. Harris, III, Indianapolis, Ind., Michael E. Kris, Washington, D. C., Lawrence H. Eiger, Chicago, Ill., pro se.

John L. Cooper (argued), Farella, Braun & Martel, San Francisco, Cal., for Lyman Lamb Co., et al.

Dale E. Fredericks, San Francisco, Cal., for Plywoods Distributing Co.

Before INGRAHAM, POLITZ and WILLIAMS, Circuit Judges.

INGRAHAM, Circuit Judge:

Three consolidated appeals, Nos. 80–3235, 80–3236 and 80–3237, arise out of (1) judgments entered in favor of four representative members of certified classes of plywood purchasers and against defendants-appellants Georgia-Pacific Corporation, Weyerhaeuser Company, and Willamette Industries, all of whom are softwood plywood manufacturers, following a special jury verdict finding that defendants had engaged in a price fixing conspiracy in violation of section 1 of the Sherman Act, 15 U.S.C. § 1 (1976), and (2) judgments imposing monetary sanctions against Georgia-Pacific and Willamette for failure to provide discovery. Another appeal, No. 80–3234, consolidated for purposes of oral argument with the abovementioned three, arises out of a judgment entered in favor of the abovenamed defendants and against certain plaintiffs who were indirect purchasers of plywood with respect to those defendants.

Appeals Nos. 80–3235, 80–3236 and 80–3237 will be referred to collectively as the *Lyman Lamb* case. Appeal No. 80–3234 will be referred to as the *French Quarter Apartments* case. Both of these cases are part of a multidistrict litigation proceeding that began as a class action on behalf of various plywood purchasers. Several similar actions were filed in district courts around the country and ordered consolidated in the Eastern District of Louisiana by the Judicial Panel on Multidistrict Litigation. *In re Plywood Antitrust Litigation*, 376 F.Supp. 1405 (Jud.Pan.Mult.Dist.Lit. 1974). Certain final judgments were entered by the district court on February 21, 1980, and certified pursuant to Fed.R.Civ.P. 54(b). Nonprevailing parties perfected these appeals from those judgments. We now affirm the judgment of the district court with respect to each appeal.

I. The *Lyman Lamb* Case

A. *Procedural Context*

This litigation commenced in the Eastern District of Louisiana in 1972 as a class action on behalf of plywood purchasers who claimed damages by reason of a price fixing conspiracy involving softwood plywood manufacturers. Numerous similar actions subsequently were filed in various district courts and eventually were ordered consolidated in the Eastern District of Louisiana. In 1976 Judge Cassibry certified the plaintiffs' classes. *In re Plywood Antitrust Litigation*, 76 F.R.D. 570 (E.D.La.1976). Thereafter, the actions were reassigned to Judge Pointer who, following defendants' motions to decertify the classes, confirmed the prior certification but redefined the class to include only direct purchasers. With the exception of defendants-appellants herein, the class claims against all other defendant softwood plywood manufacturers were resolved prior to trial.

Trial commenced on October 16, 1978, on "all issues except the amount of damages sustained by individual plaintiffs, intervenors, and class members," and concluded with a special verdict on November 14, 1978. The jury determined that defendants Georgia-Pacific, Weyerhaeuser, and Willamette, together with all other manufacturers of southern plywood, had engaged in a conspiracy in restraint of trade from February 23, 1968, to December 31, 1973 (the damage period), and that the conspiracy caused financial damage to purchasers of

southern plywood equal to the amount by which "west coast freight" (freight computed as though the product were shipped from the west coast) exceeded actual freight charges from southern shipping points (such excess being referred to herein as "phantom freight" or "freight pickup"). Similarly, the jury determined that the conspiratorial use of "standard weights" by manufacturers of western fir plywood during the damage period caused financial damage to purchasers thereof in the amount by which freight charges calculated on the basis of "standard weights" exceeded the actual freight costs incurred by defendant manufacturers (such excess being referred to herein as "underweights").

Defendants subsequently moved for judgment notwithstanding the verdict and for a new trial. In a memorandum opinion the district court denied both motions, *In re Plywood Antitrust Litigation*, 1979–1 Trade Cas. (CCH) ¶ 62,459 (E.D.La.1978), and entered an interlocutory judgment in favor of plaintiffs on the special verdict. The court expressly noted that the evidence was "sufficient not merely to create a jury issue but also to cause [the district court], like the jury, to find that there was a conspiracy and that the three defendants were parties to that conspiracy." Thereafter four members of the plaintiff classes, the Lyman Lamb Company and the other three appellees, each moved for summary judgment as to individual damages computed in accordance with the jury's verdict.[1] The district court in a memorandum opinion dated February 14, 1980, granted the motions and subsequently entered pursuant to Fed.R. Civ.P. 54(b) the February 21, 1980 judgments from which all three defendants now jointly appeal in No. 80–3237.

Prior to trial plaintiffs moved for entry of judgment against defendants Georgia-Pacific and Willamette for failure to produce various documents during discovery. The district court declined to enter adverse judgments as sanctions but, after briefing and hearing, granted plaintiffs' counsel an award of fees and expenses incurred by reason of the failure of Georgia-Pacific and Willamette to provide the requested discovery. Pursuant to Fed.R.Civ.P. 54(b), the court entered judgment against each of those defendants on February 21, 1980, from which Georgia-Pacific and Willamette respectively appeal in No. 80–3235 and No. 80–3236.

**B. Appeal No. 80–3237—Judgment on the Merits**

Synthesizing the statements of the issues contained in the appellate briefs of the parties, we find that the concerns relevant to the disposition of this appeal fall into three general categories: those relating to proof of the existence *vel non* of a statutory violation; those relating to proof of impact *vel non* on plaintiffs' business; and those relating to evidentiary admissions and jury instructions by the district court. We deal with each of these categories in turn.

**1. The Statutory Violation**

Section 1 of the Sherman Act, 15 U.S.C. § 1 (1976), provides that "every contract, combination ... or conspiracy in restraint of trade or commerce ... is ... illegal." The term "every" is not to be taken literally; instead the standard of reasonableness has been adopted to judge the lawfulness of the restraint. *Standard Oil Co. v. United States*, 221 U.S. 1, 66, 31 S.Ct. 502, 518, 55 L.Ed. 619 (1911). Certain practices, however, have such a "pernicious ef-

---

1. The damage figures set out below were stipulated to by the parties as the appropriate amounts prior to trebling if the jury's verdict is permitted to stand. To ensure that a favorable ruling on their motion for summary judgment would have the finality necessary to support an immediate appeal by the defendants, plaintiffs waived below any claim to injunctive relief. Nor, for the same reason, was an award of attorneys' fees sought on behalf of the four

movants, it being agreed by defendants, however, that time spent in connection with these claims could be included in subsequent claims for fees on behalf of other class members. Subject to those understandings, damages were awarded as follows:

| | |
|---|---|
| Lyman Lamb Co. | $ 47,952.59 |
| Plywoods Distributing Co. | 102,813.78 |
| Baton Rouge Lumber Co. | 216,448.56 |
| City of Arkadelphia, Arkansas | 89.46 |

fect on competition," *Northern Pacific Ry. Co. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958), that they are considered to be per se violations of section 1 of the Sherman Act. Among these practices is price fixing, *United States v. Trenton Potteries*, 273 U.S. 392, 47 S.Ct. 377, 71 L.Ed. 700 (1927), and the machinery employed to achieve that end is immaterial, *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 210, 60 S.Ct. 811, 838, 84 L.Ed. 1129 (1940). These long-standing principles enjoy full vitality today. *See Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 100 S.Ct. 1925, 64 L.Ed.2d 580 (1980).

In response to special interrogatories, the jury returned a verdict that defendants were engaged, along with other softwood plywood manufacturers, in a conspiracy to fix prices. Defendants attack the viability of this verdict, asserting that plaintiffs produced no evidence, either direct or circumstantial, of any such conspiracy. Accordingly, they contend that it was error for the district court to deny their motion for judgment notwithstanding the verdict. Our standard for review of that denial by the district court is well known. Considering all of the evidence in the light most favorable to the nonmoving party,

> If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury.... [I]t is the function of the jury as the traditional finder of the facts, and not the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses.

*Boeing Co. v. Shipman*, 411 F.2d 365, 374–75 (5th Cir. 1969) (en banc).

We find that there is substantial evidence, as defined in the quotation above, from which a reasonable jury, both directly and circumstantially, could find the existence of a conspiracy to fix prices. It does not strain credulity that solemnized covenants to conspire are difficult to come by in any price fixing case. Plaintiffs have, nevertheless, unearthed damaging evidence from the mouths, or typewriters, of defendants' own employees.

In 1971, James Tweedie, Softwood Plywood Product Manager for Weyerhaeuser, received an internal memorandum from Wayne Marcella, which begins as follows:

> Jim, my apologies for the delayed response on our various conversations regarding Georgia-Pacific. As you know, at the American Plywood Association meeting in Biloxi, Mississippi I made it a point to spend considerable time with [Georgia-Pacific plywood sales managers] Tom Nash and Bill Fuller. The following outlines the highlights of our conversations which ranged from customer commitments to plywood marketing practices.

The memo concludes with the following assurance: "The communication channels developed through Tom Nash and Bill Fuller offers [*sic*] an opportunity to secure specific competitive information. Therefore, it is my intention to keep this direct contact open through weekly phone conversations."

A 1969 memorandum sent to James Tweedie informs him that Georgia-Pacific personnel "have adopted the following price basis. Low Crow's less 5% less 3% plus West Coast freight. This applys [*sic*] in truck lots (Mill) &/or pick up at the local Columbia warehouse." A 1971 internal memorandum from F. V. Langfitt, Jr., Vice President of Sales, Georgia-Pacific, to Tom Nash reveals the following: "Jimmy Schmidt, Sales Manager for Boise [Cascade]'s Southern Pine Mill in North Carolina, was in the office last week and indicated that they are making all of their ½" in 3-Ply construction and are selling it all at not to exceed $1.00 under 4-Ply/5-Ply."

A 1970 memorandum from K. C. Sisson to R. W. Stewart, both of Weyerhaeuser, contains the following language:

> We have been attempting to secure information regarding Georgia-Pacific's Intermediate Glue Line and pricing for this product.
>
> . . . .
>
> Today I contacted an old acquaintance at Georgia-Pacific's Portland office, Don Martin. Don offered the following information:
>
> > They are currently manufacturing the Intermediate Glue Line, on their sheathing production at their Corvallis, Oregon mill. . . . They price the IMG $2.00 to $3.00 under their exterior level.

A copy of the memorandum was sent to James Tweedie and Wayne Marcella.

In response to a rumor that some manufacturer was deviating from the industry's practice of west-coast-freight pricing, a 1972 Georgia-Pacific memorandum from Mr. Trammel, a Regional Sales Manager, to Winston Purifoy, asks the latter the following question: "Tom Mateo advises he has heard of some Arkansas plywood mills shifting to an FOB mill pricing policy. Do you know anything about this?" Mr. Purifoy responded as follows:

> Negative. I had not heard this and called all plants. Big W[eyerhaeuser] is now encouraging their more distant truck customers to make mill pick-ups in return for an allowance. They thus are dropping their truck customers in poor freight gain areas.

A 1972 memorandum authored by James Tweedie and directed to L. V. Imhoff begins as follows:

> As a segment of our southern mill intelligence trip, a visit was scheduled with Winston Purifoy, Vice President-Sales, Southern Plywood-Particleboard, and Bill Fuller, Plywood Sales Manager [both of Georgia-Pacific]. It was a very cordial visit and one which was very informative to us. Listed below are some of the subjects discussed and their input.

Mr. Tweedie then reports the substance of his communications with the Georgia-Pacific officials regarding pricing, sales practices, and numerous other aspects of Weyerhaeuser's chief competitor's operations. The memorandum concludes with the following appraisal:

> It was a good exchange and the connection has been made to keep in touch without exposing our individual companies to any risks. Wayne Marcella [Weyerhaeuser] will stay close to Bill Fuller [Georgia-Pacific] and monitor what is happening in the south. With this connection, we should be able to round out our information on this company as it relates to plywood and more especially the south.

Without belaboring the point by citation of further examples, the record contains documents from which a reasonable jury could find that defendants and other softwood plywood manufacturers were engaged in a conspiracy to fix prices in violation of section 1 of the Sherman Act. Moreover, we have held previously that "proof of a conspiracy under § 1 of the Sherman Act does not require the existence of an express agreement. . . . It is 'enough that, knowing that concerted action was contemplated and invited, the [defendants] gave their adherence to the scheme and participated in it.'" *Gainesville Utilities Dept. v. Florida Power & Light Co.*, 573 F.2d 292, 300 (5th Cir.), *cert. denied*, 439 U.S. 966, 99 S.Ct. 454, 58 L.Ed.2d 424 (1978) (citations omitted). The parallel pricing conduct clearly demonstrated in the record plus the numerous items of direct evidence of communication between high-level personnel on pricing policy adequately support the jury's verdict. *Cf. id.*, 575 F.2d at 301 and n.13 (evidence points so strongly to the existence of a conspiracy that reasonable men could not arrive at a contrary verdict).

### 2. The Impact on Plaintiffs' Business

■ Section 4 of the Clayton Act, 15 U.S.C. § 15 (1976), provides that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor . . . and shall recover threefold the damages by

him sustained." To prevail in an antitrust action, a plaintiff must show both an injury to his business resulting from the defendants' wrongful actions, and some indication of the amount of the damage done. *See Terrell v. Household Goods Carriers' Bureau*, 494 F.2d 16, 20 (5th Cir. 1974). These two elements of impact may be characterized as fact of damage and measure of damage.

■ As to the former element, defendants contend that plaintiffs failed to meet their burden of proving the fact of damage *with certainty*. Certainty, however, was not the burden of persuasion that plaintiffs had to meet. To satisfy the first element of impact, plaintiffs had only to persuade the jury *by a preponderance of the evidence* that defendants' price fixing conspiracy injured them in their business or property. *E. g., Gainesville Utilities Dept. v. Florida Power & Light Co.*, 573 F.2d at 294 n.3, 304–05.

■ Fact of damage is a question of the sufficiency of the evidence. *Terrell v. Household Goods Carriers' Bureau*, 494 F.2d at 20. Where, as here, plaintiffs prove a statutory violation in the form of a price fixing conspiracy with respect to a homogeneous or fungible product that was marketed in a similar manner throughout the country, it is not unlikely that plaintiffs also will be able to prove by a preponderance of the evidence that purchasers of the product in question were injured in their property or business. *See Alabama v. Blue Bird Body Co.*, 573 F.2d 309, 324 (5th Cir. 1978). Indeed, an independent review of the record before us reveals substantial evidence from which a reasonable jury could find that present plaintiffs were thusly injured when they purchased softwood plywood from these defendants and their co-conspirators. Plaintiffs' expert economic witness so testified at trial, in contraposition to the testimony of defendants' expert witness. The jury accepted the credibility of the former and rejected that of the latter. We find no basis for disturbing the jury's verdict on appeal.

■ Defendants also argue that there was insufficient evidence to support plaintiffs' claimed measure of damages, *i. e.*, the amount of phantom freight and underweights paid by plaintiffs to defendants. We disagree. As we recently held in *Malcolm v. Marathon Oil Co.*, 642 F.2d 845, 858 (5th Cir. 1981), once anti-trust plaintiffs have proved the fact of damage, their burden on proving the measure of damages becomes lighter. "The amount of damage may be shown by just and reasonable inference with juries voting upon the probable and inferential as well as upon direct and positive proof." *Id.* (citing *Terrell v. Household Goods Carriers' Bureau*, 494 F.2d at 23–24). "In fact, given proof of the fact of damage, proof of losses which border on the speculative is allowed in order to facilitate the policy of the anti-trust laws." *Id.* (citing *Hobart Bros. Co. v. Malcolm T. Gilliland, Inc.*, 471 F.2d 894, 903 (5th Cir.), *cert. denied*, 412 U.S. 923, 93 S.Ct. 2736, 37 L.Ed.2d 150 (1973)).

Plaintiffs' expert witness testified that if competition had been at work in the plywood industry during the damage period, it would have eliminated the ability of defendant plywood manufacturers to realize additional revenue in the amount of the phantom freight charged on the sale of southern plywood. Likewise, plaintiffs' economist testified that the effect of the conspiratorial use of underweights in the delivered pricing of western plywood was to increase the price paid by buyers by the amount of those underweights. The jury chose to accept the testimony of plaintiffs' economist and to reject the contrary testimony of defendants' economist. Based on the evidence in the record before us, we cannot say that it was unjust or unreasonable for the jury to so conclude. *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 264–65, 66 S.Ct. 574, 579, 90 L.Ed. 652 (1946).

Finally, defendants argue that it was reversible error for the district court even to submit the question of measure of damage, as distinct from that of fact of damage, to the jury. In its pretrial order of March 27, 1978, the district court advised all parties that trial was set for October 16, 1978, over

one-half year later, *"upon all issues except the following, which are severed for subsequent trial as appropriate: (1) amount of damages sustained by individual plaintiffs, intervenors, and class members."* Plaintiffs went to trial contending that the alleged conspiracy caused them injury in the form of overcharges for phantom freight and underweights. Defendants tried to convince the jury that their pricing system caused no economic injury to anyone. The jury, agreeing with plaintiffs and disagreeing with defendants, returned its special verdict upholding plaintiffs' theory. Having failed to persuade the first jury that their challenged practices caused damage to no one, defendants now seek the opportunity to convince a different jury that some other measure of damages is appropriate.

■■■ This court has already established the principle that, in a bifurcated proceeding, the issue or issues to be tried separately in the second trial must be so distinct and separable from the others that a trial of it or them alone may be had without injustice. "Such a rule is dictated for the very practical reason that if separate juries are allowed to pass on issues involving overlapping legal and factual questions the verdicts rendered by each jury could be inconsistent." *Alabama v. Blue Bird Body Co.,* 573 F.2d at 318. *See Gasoline Products Co. v. Champlin Refining Co.,* 283 U.S. 494, 51 S.Ct. 513, 75 L.Ed. 1188 (1931); *Swofford v. B & W, Inc.,* 336 F.2d 406 (5th Cir. 1964), *cert. denied,* 379 U.S. 962, 85 S.Ct. 653, 13 L.Ed.2d 557 (1965).

■■■ In reaching a decision on plaintiffs' theory of injury, the jury necessarily had to resolve plaintiffs' claim that defendant manufacturers' addition of west coast freight to the selling price of southern pine plywood shipped from southern mills, and their use of standard weights in the pricing of western fir plywood, increased those prices. Allowing a second jury to consider some alternative measure of damage preferred by defendants would unavoidably involve reconsideration of those issues, an outcome impermissible under *Blue Bird.* At present, the issue remaining before the district court involves only the mathematical computations that must be performed upon the transactional details of the individual purchasers and purchases. Resolution of those issues, whether by jury, court, or stipulation, will not implicate the integrity of the original jury verdict. We find no error in the district court's bifurcation procedure or in its submission to the jury of the measure of damage. *Cf. In re Corrugated Container Antitrust Litigation,* 1980–81 Trade Cas. (CCH) ¶ 63,669 (S.D.Tex.1980) (jury permitted to determine liability, impact, and measure of damage, with exact dollar amounts of damage awards to be computed later).

### 3. Evidentiary Admissions and Jury Instructions

■■■ The remainder of defendants' issues in appeal No. 80–3237 of the *Lyman Lamb* case deal with the admission of certain evidence and with certain instructions by the district court to the jury. First, defendants complain that the court committed prejudicial error by allowing plaintiffs to introduce the findings of an Administrative Law Judge adopted by the Federal Trade Commission in an opinion concluding proceedings against these and other plywood manufacturers pursuant to section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45 (1976).[2] We disagree.

2. *Boise Cascade Corp.,* 91 F.T.C. 1 (1978). The Commission there found that the same practices as challenged by plaintiffs here were unfair methods of competition under § 5 of the Federal Trade Commission Act and enjoined their continuance. The Ninth Circuit declined to enforce the Commission's order. *Boise Cascade Corp. v. FTC,* 637 F.2d 573 (1980). Defendants argue that "the Ninth Circuit findings, when they become final, should collaterally estop plaintiffs in this action on every principal issue." We reject that position. The FTC proceeding tested the conduct of these defendants and others under § 5 of the Federal Trade Commission Act, 15 U.S.C. § 45 (1976). Plaintiffs brought suit against these defendants and others under § 1 of the Sherman Act, 15 U.S.C. § 1 (1976). The Commission expressly declined to reach the conspiracy issue, stating that it was unnecessary to a determination under § 5.

The district judge carefully and extensively edited from those findings any finding that indicated or tended to indicate the Commission's conclusions or the outcome of the proceedings. He also edited the findings to eliminate any possible prejudice to defendants. The findings that were admitted were limited to historical and objective descriptions of the industry, production statistics, and industry practices. They neither stated nor implied that the practices were or were not collusive or anticompetitive in origin, operation, or effect. Moreover, the admitted findings were simply cumulative in nature. With insignificant exceptions, the admitted findings were supported by independent evidence in the record.

The court carefully instructed the jury that the findings were the result of an *inquiry* into the pricing practices in the plywood industry, the "outcome and results of [which] really are not of significance or consequence here to this case." He also stated that they were not binding upon the jury, but that "they may be received as evidence instead of, for example, having a witness testify to those matters or instead of having a document introduced to show it. It is simply evidence to be considered by you along with all the other evidence in the case."

▮ We also conclude that it was not an abuse of the district court's discretion to admit the findings under Fed.R.Evid. 803(8)(C). *Cf. Chandler v. Roudebush*, 425 U.S. 840, 863 n.39, 96 S.Ct. 1949, 1960, 48 L.Ed.2d 416 (1976) (administrative findings with respect to employment discrimination claim admissible); *Lloyd v. American Export Lines, Inc.*, 580 F.2d 1179, 1183 (3rd Cir.), *cert. denied*, 439 U.S. 969, 99 S.Ct. 461, 58 L.Ed.2d 428 (1978) (findings in Decision and Order of Coast Guard hearing examiner admissible); *United States v. School District of Ferndale*, 577 F.2d 1339, 1354–55

(6th Cir. 1978) (findings of Department of Health, Education, and Welfare hearing examiner in school-segregation fund-termination proceeding admissible). Furthermore, defendants came forward with no evidence sufficient to impugn the trustworthiness of the proffered findings. *See Melville v. American Home Assurance Co.*, 584 F.2d 1306, 1316 (3rd Cir. 1978). Defendants' arguments on this issue fail.

▮ Defendants also complain about the court's charge to the jury in two particulars. First, they contend that it was improper even to give the jury an instruction on the meaning of the term "contract" as it is used in section 1 of the Sherman Act, since supposedly there was no evidence in the record of any contract containing, referring to, or suggesting an agreement to use west coast freight or standard weights. Our examination of the record, however, discloses examples of exactly the sort of document whose existence defendants deny—memorializations of agreements mutually to preserve freight pickup (phantom freight) on intercompany sales for resale, and even offers to contract for intercompany sales, guaranteeing certain levels of freight pickup, for the expressly stated reason of "doing everything possible to stabilize prices, especially in those markets close to the plant" where the offeror was experiencing price cutting. It was not error for the court to instruct the jury on the meaning of the term "contract" as used in section 1 of the Sherman Act.

▮ Finally, defendants contend that the court charged the jury that it could consider contracts between manufacturers and opportunity contacts *in themselves* as evidence of a conspiracy. We do not read the record in this way. The learned district judge charged the jury that "these transactions, these contracts, in and of themselves are not illegal. Indeed, they may be vehi-

*Boise Cascade Corp.*, 91 F.T.C. at 102. Here, plaintiffs proved a conspiracy to the satisfaction of the jury and of the district court. The record evidence presented to the jury and court below included testimony by witnesses who did not appear before the Commission. Signifi-

cantly, the FTC staff presented no expert testimony in support of its case, whereas plaintiffs below put their expert economist before the jury. In short, we are not bound by the Ninth Circuit's opinion in *Boise Cascade*.

cles for fostering competition." Phrasing in the conjunctive, he then charged that "such matters may also be conduct that, when viewed on their own *and in the light of the other evidence*, indicate that there were agreements, express or implied, reached between manufacturers that they would use, in selling plywood to others, West Coast freight or standard weights." The learned judge then proceeded at length to stress that intercompany sales agreements and trade meetings were not *in and of themselves* evidence of illegality under the Sherman Act. "We are convinced from a careful reading of the entire charge that it was, in substance, correct." *Associated Radio Service Co. v. Page Airways, Inc.*, 624 F.2d 1342, 1358 (5th Cir. 1980), *cert. denied*, 450 U.S. 1030, 101 S.Ct. 1740, 68 L.Ed.2d 226 (1981). *See Andry v. Farrell Lines, Inc.*, 478 F.2d 758 (5th Cir. 1973) (if charge viewed as a whole correctly instructs on the law, even though portion be technically imperfect, no harmful error is committed).

### C. Appeals Nos. 80–3235 and 80–3236— Discovery Sanctions

Defendants Georgia-Pacific and Willamette have taken separate appeals from judgments entered by the district court imposing sanctions for their failure to cooperate fully in discovery. In the case of Georgia-Pacific, the failure related to monthly tabulations, known as invoice registers, that recorded freight pickup (phantom freight) realized by the company on each individual sale. With respect to Willamette, the failure related to comparable tabulations of underweights realized on shipments of western fir and southern pine plywood. Each party was fined $10,000 plus certain minor expenses.

Fed.R.Civ.P. 37(d) provides in pertinent part that "[i]f a party . . . fails . . . to serve answers or objections to interrogatories . . . the court in which the action is pending on motion may make such orders in regard to the failure as are just." Plaintiffs moved for judgment against each of these defendants on the basis of its failure forthrightly to reveal the existence of the subject documents, despite several discovery attempts to ascertain their existence. The district court declined to grant judgment against defendants, but instead imposed the far lesser sanction of awarding to plaintiffs' counsel a reasonable if somewhat conservative estimate of their expenses incurred in ultimately ferreting out the documents.

 Our standard for reviewing the propriety of these sanctions is whether the district court abused its discretion in imposing them. *National Hockey League v. Metropolitan Hockey Club, Inc.*, 427 U.S. 639, 642, 96 S.Ct. 2778, 2780, 49 L.Ed.2d 747 (1976). On the facts of this case and after a careful review of the record, including the hearing on the motion, we cannot say that we are left with the definite and firm conviction that the district court committed a clear error of judgment in the conclusion it reached after its weighing of the relevant factors. *See Dorey v. Dorey*, 609 F.2d 1128, 1135–36 (5th Cir. 1980). *Cf. Airtex Corp. V. Shelley Radiant Ceiling Co.*, 536 F.2d 145, 154–55 (7th Cir. 1976) (under appropriate circumstances, evasive and incomplete answers to interrogatories are tantamount to no answers at all). We affirm the judgment of the district court awarding to plaintiffs' counsel discovery sanctions against Georgia-Pacific and Willamette.

### II. The *French Quarter Apartments* Case, No. 80–3234

Appellants in this case are certain of the Oklahoma builder-developer plaintiffs who filed an action on November 6, 1974, in the United States District Court for the Western District of Oklahoma,[3] alleging violations of section 1 of the Sherman Act by the appellee plywood manufacturers, producing damages in their business and property compensable under section 4 of the Clayton Act. The alleged violations involve the same use of phantom freight and standard weights as that complained of in the *Lyman Lamb* case. Prior to the filing of a responsive pleading, the litigation was conditional-

---

**3.** *American Millwork Co. v. Boise Cascade Corp.*, No. CIV–74–948.

ly transferred to the United States District Court for the Eastern District of Louisiana for consolidated pretrial proceedings under MDL Docket No. 159.

After nearly three years of pretrial discovery by these parties, the Supreme Court handed down its decision in *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977).

Nearly five months later, defendants moved under Fed.R.Civ.P. 56 for summary judgment against twenty-nine of the Oklahoma builder-developer plaintiffs on the ground that they were indirect purchasers and therefore were barred from recovering any alleged damages by the rule of *Illinois Brick*. Some of those twenty-nine plaintiffs responded to the summary judgment motion with affidavits, arguably contradictory to their previous interrogatory answers, asserting that they had purchased plywood from defendants both on a direct and on an indirect basis. The remainder of the twenty-nine plaintiffs, concededly indirect purchasers, resisted the summary judgment motion on the ground that Congress soon would overturn legislatively the Supreme Court's decision in *Illinois Brick*. These indirect-purchaser plaintiffs argued that "[i]f the Court were to grant defendants' Motion now, the Court and all counsel may well find themselves faced with the task of putting the pieces back together months from now. [*sic*] Particularly since legislative attempts to overrule *Illinois Brick* are retroactive."

Finding a genuine issue of material fact with respect to those plaintiffs asserting direct-purchaser status, the district court denied the motion for summary judgment as against them. Finding no genuine issue of material fact with respect to the concededly indirect-purchaser plaintiffs, the district court in pretrial proceedings on March 30, 1978, granted defendants' motion as against these plaintiffs. On February 21, 1980, the district court entered its memorandum of opinion reaffirming its March 30 ruling and directed the entry of an adverse final judgment under Fed.R.Civ.P. 54(b) against those indirect-purchaser plaintiffs who are appellants here.

In their appellate briefs, indirect-purchaser plaintiffs argue at length that their claims are not foreclosed as a matter of law by the Supreme Court's decision in *Illinois Brick*. In *Illinois Brick*, the court reaffirmed the principles of *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968), barring the defensive use of "passing on" and applied them to indirect-purchaser plaintiffs attempting to use "passing on" offensively against remote defendants. In *Hanover Shoe*, the Court "indicated the narrow scope it intended for any exception to its rule barring pass-on defenses by citing, as the only example of a situation where the defense might be permitted, a pre-existing cost-plus contract." *Illinois Brick*, 431 U.S. at 736, 97 S.Ct. at 2069. Raising the same bar against offensive "passing on" in *Illinois Brick*, the Court retained the "narrow scope" of any exception to the rule: "*Hanover Shoe*, itself implicitly discouraged the creation of exceptions to its rule barring pass-on defenses, and we adhere to the narrow scope of exemption indicated by our decision there." *Id.* at 745, 97 S.Ct. at 2074.

Appellants contend that the exception to the *Illinois Brick*, bar, albeit narrow, extends to cases other than those involving pre-existing cost-plus contracts *per se*. They contend that *Hanover Shoe* and *Illinois Brick* permit the offensive assertion of "passing on" in situations that are the functional equivalent of the cost-plus contract case. Not surprisingly, then, appellants now assert that *their* purchasing situation was the functional equivalent of a cost-plus contract and argue that it thus was error for the district court to grant summary judgment adverse to them.

■ The initial defect in this argument is that appellants press it for the first time before this court on appeal. Absent exceptional circumstances, appellate courts refuse to consider an issue raised for the first time on appeal. *Matter of Novack*, 639 F.2d 1274, 1276–77 & n.5 (5th Cir. 1981); *Commercial Credit Business Loans, Inc. v.*

*St. Louis Terminal Field Warehouse Co.,* 514 F.2d 75, 77 (5th Cir. 1975); *Admas v. Askew,* 511 F.2d 700, 705 & n.9 (5th Cir. 1975).

After thoroughly reviewing the voluminous record, we find no exceptional circumstances that would in any way justify our departure from this well-settled rule. Following the rendition of *Illinois Brick,* despite ample opportunity to do so, indirect-purchaser plaintiffs never moved the district court for permission to amend their pleadings pursuant to Fed.R.Civ.P. 15(a) and thereby to allege any reason, factual or legal, why their case lay without the bar imposed by *Illinois Brick.* They never argued to the district court that their purchasing relationships with their middlemen-suppliers were the functional equivalent of a pre-existing cost-plus contract situation. Following entry of the adverse final judgment on February 21, 1980, they never moved the district court to alter or amend its judgment pursuant to Fed.R.Civ.P. 59(e).

Appellants now attempt to argue that reversal of the district court is compelled by our treatment of *In Re Beef Industries Antitrust Litigation,* 600 F.2d 1148 (5th Cir. 1979), *cert. denied,* 449 U.S. 905, 101 S.Ct. 280–81, 66 L.Ed.2d 137 (1980). *Beef Industries* involved an antitrust action by sellers against allegedly monopsonistic and oligopsonistic remote buyers. Plaintiffs there, cattle ranchers, cattle feedlot owners, and both, alleged that the indirect-buyer defendants, retail food chain stores, conspired to fix the prices at which they purchased carcass beef from packinghouses and slaughterers, and that the packinghouse and slaughter middlemen in turn set the prices at which they bought fat cattle from plaintiffs by rigidly applying certain formulae to the defendants' offering prices for carcass beef.

The district court in *Beef Industries* dismissed plaintiffs' action *on the pleadings.* We reversed, finding that plaintiffs had adequately alleged a cause of action within the cost-plus exception to *Hanover Shoe* and *Illinois Brick.* We held the pleadings sufficient because the strict formula buying allegedly rigidly practiced by the *middlemen* in their purchasing relationships with *plaintiffs* was the functional equivalent of the cost-plus contract situation. If plaintiffs there were successful in proving their case *as alleged,* they would have demonstrated that the impact of the illegal overcharge was determined in advance without reference to the interactions of supply and demand. "When the impact of an overcharge on a middleman's pricing decisions can be so determined, the uncertainties involved in resorting to general economic theorems are avoided and the clarity of the evidence virtually eliminates the possibility of overlapping liabilities as the result of inconsistent verdicts in separate lawsuits." *Beef Industries,* 600 F.2d at 1164. Thus were certain plaintiffs successful in avoiding the bar erected by *Hanover Shoe* and *Illinois Brick,* for purposes of testing the sufficiency of their pleadings.

Other *Beef Industries* plaintiffs, however, were not so successful. The complaints at issue there did not allege that feeders or brokers (certain of the various plaintiffs) passed on price depressions to ranchers who themselves did not deal with the slaughterer and packinghouse middlemen. We therefore held that "[u]nder the allegations of the complaint only those plaintiffs who sold directly to the packers or slaughterers that engaged in strict formula buying are entitled to maintain damage claims." *Id.* at 1167.

██ Appellants in the present case share the same shortcoming that afflicted the unsuccessful plaintiffs in *Beef Industries*: they simply have not alleged a viable cause of action under *Hanover Shoe-Illinois Brick.* Even as regarded those plaintiffs in *Beef Industries* whose pleadings were sufficient, we expressed the following *caveat*:

> We emphasize that we are not ruling that these plaintiffs are entitled to go to trial. The Supreme Court intended that it be determined early in the litigation whether (or to what extent) a party should be entitled to present a pass-on theory at trial. The defendants will have the opportunity to raise that issue again by

summary judgment motion. Given the strictures of *Hanover Shoe* and *Illinois Brick*, the district court may and should demand from the plaintiffs in each case a pretrial demonstration that they have definite and particularized proof that they will need to establish damages.

*Id.* at 1166–67.

Appellants here never attempted to conform their allegations to the requirements of *Hanover Shoe-Illinois Brick*, even in the face of defendants' motion for summary judgment. Despite deposition testimony taken from dozens of witnesses with both direct and indirect buying experience, appellants do not cite a single example of functional equivalence with a *pre-existing* cost-plus contract, *cf. Eastern Airlines, Inc. v. Atlantic Richfield Co.*, 609 F.2d 497, 499 (TECA 1979) (to be legally sufficient any functional equivalent of a cost-plus contract exception to the *Hanover Shoe* ban against defensive use of passing on must be one that is already in existence so that its impact on middlemen's pricing decisions can be known in advance), much less *rigid and uniform adherence* to any such business arrangements, see *Beef Industries*, 600 F.2d at 1165 & n.21. Appellants do not even allege that their suppliers used the cost-plus "rules of thumb" rejected by the *Illinois Brick* Court as insufficient. *See Illinois Brick*, 431 U.S. at 744, 97 S.Ct. at 2073. In fact, nowhere do appellants describe *any* of their middlemen-suppliers' sales practices. They merely assert for the first time on appeal—without explanation or record cite—that the cost element represented by phantom freight and standard weights is "readily identifiable throughout the chain of distribution" until such time as plywood becomes a component of an erected structure.

In their brief to this court, appellants concede "the fact that a middleman may charge more or less for the plywood because of supply and demand forces" but contend that the middleman's conduct "is totally irrelevant to the issue presented by this case." We disagree. The ability to determine the impact of defendants' pricing be-

havior on a middleman's subsequent pricing decisions in that middleman's dealings with indirect-purchaser plaintiffs is the crux of appellants' right to maintain their action. Appellants have not alleged, much less demonstrated, their entitlement to this right.

Appellants further argue that they were under no duty to counter defendants' Rule 56 motion with appropriate summary judgment evidence, since that motion was legally insufficient. The argument appears to run as follows. After the Supreme Court handed down *Illinois Brick*, defendants moved for summary judgment on the basis of that case. Unfortunately for defendants, they merely asserted that plaintiffs were indirect purchasers and therefore were barred. Significantly, defendants never proved the absence of a genuine issue of material fact with respect to the functional equivalence of pre-existing cost-plus contract arrangements. Defendants' motion thus being legally insufficient, plaintiffs never were under any obligation to counter it.

Unfortunately for appellants, their argument merely begs the question. We see no logical reason to hold that defendants were under an obligation to prove the absence of some threshold element of plaintiffs' case, where plaintiffs never even bothered or were factually unable to put that element in issue, either through their complaints or through their resistance to defendants' motion for summary judgment. Despite the liberality of modern rules of pleading, a complaint still must contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under *some* viable legal theory. *See City of Gainesville v. Florida Power & Light Co.*, 488 F.Supp. 1258, 1263 (S.D.Fla.1980) (citing C. Wright & A. Miller, 5 Federal Practice and Procedure § 1216, at 121–23); *cf. McClain v. Real Estate Board of New Orleans*, 444 U.S. 232, 242, 100 S.Ct. 502, 509, 62 L.Ed.2d 441 (1980) (to establish federal antitrust jurisdiction on ground of relationship to interstate commerce, plaintiff must allege the critical relationship in the pleadings and, if

allegations are controverted, must demonstrate relationship by submission of evidence beyond the pleadings). As now-Chief Justice Burger once argued, "if a pleader cannot allege definitely and in good faith the existence of an essential element of his claim, it is difficult to see why this basic deficiency should not be exposed at the point of minimum expenditure of time and money by the parties and the court." *Daves v. Hawaiian Dredging Co.*, 114 F.Supp. 643, 645 (D. Hawaii 1953).

Finally, appellants argue that even if defendants' motion for summary judgment was legally sufficient, they nevertheless adequately countered the motion with respect to genuine issues of material fact. In support of this position, appellants contend in their brief to this court that before the district court they "argued that the award of summary judgment would be inappropriate, that the award of summary judgment pursuant to Rule 56 would be 'premature' and that *Illinois Brick* did not require the granting of summary judgment, even as to those plaintiffs who had bought plywood only on an 'indirect' basis." To bolster this contention, appellants attempt to quote from their trial memorandum, to the following effect:

> In fact, the separate opposing memorandum filed by appellants in the district court expressly stated:
>
> "The position of the plaintiffs in *American Millwork Company* case is as follows:
>
> 1. All such plaintiffs have concurred in the supposition [*sic*] set forth in plaintiffs' memorandum [*sic*] in opposition to defendants' motion for partial summary judgment with respect to the *Illinois Brick* decision. It is thus their position that *Illinois Brick* does not require the granting of defendants' motion, even as to those who have bought only indirectly."

Our careful scrutiny of the record, however, convinces us that this argument borders on the frivolous. In their "supplemental response opposing summary judgment," appellants made no arguments whatsoever

concerning *indirect*-purchaser plaintiffs, except for the bald conclusory statement quoted above. With that exception, the memorandum is an argument for the position that *direct*-purchaser plaintiffs in the case should not suffer adverse summary judgment, despite their interrogatory responses in which they arguably characterize themselves as indirect purchasers. Attached to the memorandum are affidavits of six plaintiffs averring that they purchased plywood directly from one or more of the defendants.

The "memorandum in opposition to defendants' motion for partial summary judgment," filed by lead counsel on behalf of all plaintiffs in the multidistrict litigation and in which these appellants expressly joined (see quoted paragraph 1 above), serves appellants no better. The arguments in the litigation-wide memorandum, insofar as indirect purchasers like appellants here are concerned, are bottomed solely on efforts then extant to overturn legislatively *Illinois Brick*, and the resulting judicial inefficiency should those efforts prove successful. The following illustration accurately subsumes all relevant arguments proffered.

> Plaintiffs specifically enumerated in Exhibit "B" hereto have not during the relevant discovery period made direct purchases of softwood plywood. Nevertheless, defendants' Motion should be denied at this time. Legislation is pending in both the U. S. Senate and the House of Representatives to overrule the holding in *Illinois Brick*. [citations]. Until such time as the form, scope and result of these legislative efforts are more clear, terminating the actions of the plaintiffs listed in Exhibit "B" hereto should be deferred.
>
> . . . .
>
> If the Court were to grant defendants' Motion now, the Court and all counsel may well find themselves faced with the task of putting the pieces back together months from now . . . . The cost of judicial and legal energies and resources required by that task would be considerable.

Suffice it to say that the Illinois Brick wall still stands. Appellants have yet to demonstrate, or even allege, the factual rungs of any ladder by which they legally might scale that wall. "Simple, conclusory statements alleging the existence of a factual issue are insufficient to defeat a motion for summary judgment." *Lefrak v. Arabian American Oil Co.*, 487 F.Supp. 808, 815 (E.D.N.Y.1980) (granting summary judgment adverse to indirect purchaser *even after* complaint amended to allege pre-existing cost-plus contract).

III. Conclusion

To summarize, we hold three things. First, in appeal No. 80–3234, we affirm the judgment of the district court in favor of defendants-appellees Georgia-Pacific, Weyerhaeuser, and Willamette on the ground that indirect-purchaser plaintiffs-appellants lacked standing under *Illinois Brick* to maintain their action against those defendants. Second, in appeals Nos. 80–3235 and 80–3236, we affirm the judgment of the district court awarding discovery sanctions against defendants-appellants Georgia-Pacific and Willamette, respectively. Third, in appeal No. 80–3237, we affirm the judgment of the district court finding defendants-appellants Georgia-Pacific, Weyerhaeuser, and Willamette guilty of conspiring to fix prices in violation of section 1 of the Sherman Act, 15 U.S.C. § 1 (1976), and awarding plaintiffs-appellees damages computed in accordance with the measure of damage as found by the jury.

AFFIRMED.